CITIZENS BANKING CO. *v.* PEACOCK & CARR.

1. There was, in the trial of an action of trover for the recovery of cotton from a warehouse partnership, no error in refusing to permit the introduction in evidence of warehouse receipts for cotton, not shown to have been executed by the partnership, or under its authority.

2. To create a pledge or pawn, it is necessary that the property pledged shall be delivered into the possession of the pledgee, but delivery may be either actual or constructive; and when warehouse receipts for cotton are delivered in pledge, the effect of such delivery is to deliver the cotton itself.

3. Where a warehouse receipt acknowledging the receipt from a designated person of so much cotton "subject to the presentation of this receipt only," is delivered as collateral security, this is sufficient, though such receipt be not indorsed, to transfer the title and possession of the property represented. This is undoubtedly true if such be the intention of the parties.

4. When such a receipt is delivered to another person as collateral security, upon such delivery the warehouseman, though he has no notice of the transfer, becomes the bailee of the person receiving such receipt as collateral security.

5. If in a given case it be shown that the pledgee of the cotton transferred as collateral security, evidenced by delivery of the warehouse receipt, has in fact received the proceeds of such cotton, the title of the pledgee to the cotton is extinguished; but the burden of proof rests on the defendant, in an action by the pledgee against the warehouseman for the recovery of the cotton, to show the receipt of such proceeds by the pledgee.

6. The pledgee of a warehouse receipt given as collateral to secure the payment of a debt for money loaned to the pledgor, has a special property in the cotton represented by such warehouse receipt, and can maintain an action of trover against the warehouseman to recover the cotton represented in the receipt, when on demand the latter fails or refuses to deliver the cotton for which such receipt was issued.

7. Under the evidence disclosed by the record, it was error to grant a nonsuit, but the case should have been submitted to the jury.

Argued October 23, — Decided November 30, 1897.

Complaint in trover.   Before Judge Smith.   Dodge superior court. , March term, 1897.

The Citizens Banking Company of Eastman brought its action against Peacock & Carr for the recovery of 67 bales of cotton, described in the petition, and alleged to be of the value of · $5,000, to which the plaintiff claimed title.   The defendants in their answer denied that the plaintiff had title to the cotton sued for, or such an interest therein as would entitle plaintiff to maintain an action for the recovery thereof.   They alleged that it was the property of persons who deposited it in defendants' warehouse, and who withdrew, shipped and sold it; that accompanying each shipment the depositor sent a bill . of lading with a draft on his commission merchant in favor of the plaintiff, and that in this way all of the cotton sued for was withdrawn from the warehouse; that these shipments were made with the knowledge and consent of plaintiff; and that plaintiff received the proceeds arising from the sale of the cotton.   Upon the trial the court, at the conclusion of the evidence for the plaintiff, granted a nonsuit.   To this, and to the rulings hereafter stated, the plaintiff excepted.

The evidence was, in substance, as follows:   Plaintiff introduced 64 cotton receipts, issued to various persons by the defendants, covering 64 bales of the cotton sued for, and the execution of which was admitted by the defendants.   Each of the receipts stated that the cotton covered thereby was received at Peacock & Carr's warehouse in Eastman, "subject to the presentation of this receipt only on paying customary expenses and all advances.   Acts of Providence and fire excepted." The plaintiff offered in evidence three other receipts for cotton described in the declaration, each acknowledging the receipt of one bale at Peacock & Carr's warehouse in Eastman, and containing the same recitals contained in the receipts admitted in evidence, but not signed in the same manner.   Each of these receipts was ruled out by the court, on the ground that it was not signed by the manager of the warehouse.   One of them was not signed by the manager of the warehouse; the other two were signed "J. C. D.," followed by the printed word "manager."   At the top of each were printed the words "·Pea-

cock & Carr's Warehouse." All of the receipts admitted in evidence were signed either by C. G. Brown, Brown & Jones, or L. M. P., "for managers," or "for the proprietors."

Caldwell, cashier of the Citizens Banking Company of East-man, and a member of said banking firm, testified, in sub-stance: The warehouse receipts involved in this suit are the property of the Citizens Banking Company, and were taken by us during the season of 1895–96 from L. M. Curry as collat-eral security for money he was due us, the indebtedness being on account of money advanced to pay for the cotton repre-sented by the receipts, and to pay for storage on the cotton. He would send the receipts, with his check attached, which we would pay, and we would hold the receipts as collateral. We did not buy any cotton from him. We have never been re-paid the money paid by us for the cotton represented by these receipts. The amount of Curry's indebtedness to us on the receipts is $2,469.15 principal, besides interest. Peacock, of the firm of Peacock & Carr, knew that we were paying for the cotton that Curry bought, and that we were holding the re-ceipts as collateral for the money. My reason for saying this is, that he transacted business there himself, and in some in-stances would bring receipts for cotton to the bank, with drafts attached, and we would pay them and keep the receipts. I do not know whether he had a check for any of this particular cotton or not. I did not inform Peacock that we held these particular receipts until I made a demand for the cotton repre-sented by them. In the spring of 1896, before this suit was instituted, I made a demand on the defendants, in behalf of the plaintiff, for the cotton represented by the receipts. They did not give me the cotton. When I made the demand Carr said he did not know anything about it; to see Peacock. Then I saw Peacock, and he said the cotton was not there, and that it was not in his possession. At the time of the demand, the cotton was worth about eight cents per pound. I did not know that the cotton represented by these receipts was gone until I made the demand for it. I do not know, but I presume Curry shipped the cotton out of the warehouse. He got the receipts for it. When he would get the bill of lading he would get

the receipts.—The witness was asked: When he would load two or three car-loads of cotton he would get a bill of lading and give it to you, and the check, and you would send the check along with the bill of lading, and when it was sold in Savannah you would get pay for it? Answer: He would give me the check. I do not know who shipped the cotton. He did not draw a check in favor of the bank. Q. Was the bank paid for any part of the cotton? A. I never kept any special invoice of the cotton, and we never kept any books of double entry. Q. Didn't you know Curry was shipping cotton out of there? A. Yes, of course. Q. You did not object to his shipping it? A. No. Q. He went and shipped it out when he wanted to? He would get the bill of lading and give you the check? A. I thought he was. We didn't tell Peacock & Carr at any time that we objected to his taking out the cotton. I do not think the bank has received the proceeds from the sale of most of that cotton.—Counsel read to the witness, from one of the receipts, a description of the cotton for which it was given, and asked if he would swear that the bank never collected the proceeds of that bale. He answered: I do not know. I know we paid for so many bales of cotton, and did not get pay for them. We never kept a double-entry set of books of every bale of cotton. Q. Do you know whether you have been paid for these bales, the subject of this suit, or not? A. No. We had them and collected. Q. Isn't this true, that whenever Curry would send off a shipment of say 40 or 50 bales of cotton, he would just turn over that number of receipts, without reference to whether they represented those particular bales of cotton or not? A. That is true. I can not state the value of any of this cotton represented by these receipts. I do not know how many bales he gave us the proceeds of that year. Our books do not show. If he had given me bills of lading the receipts would not be there. He gave me the receipts before I got the bills of lading. I did not ask him how he got the cotton out of the warehouse. I do not know of a single instance in which he got cotton out of the warehouse without the receipt. The cotton was in our possession at the time we received the bills of lading. Before the bill of lading was at-

tached, the cotton was in our possession. We held the warehouse receipt for it. That was all the possession we had. When bills of lading were presented, a draft accompanied them. These drafts were for so many bales, on factors in Savannah. Curry would take so many receipts, say fifty, or of whatever number of bales he shipped. The bill of lading did not specify the number or mark of the cotton. He took out the receipt the bill of lading called for. He took out the receipt for cotton he was shipping, which was loaded from the track in front of the warehouse. The loading of the cars was under the supervision of the warehouse. I do not know who loaded the cotton on the cars, as I did not see it loaded. We did not consent for any of the cotton sued for to be loaded and shipped. I thought we would get bill of lading before it was shipped; we always did before it was gone. I knew of no understanding or arrangement between Peacock and Curry as to the loading of the cotton and the issuing of the bills of lading. I would not have let Curry ship more than he gave me bills of lading for, if I had known it. I did not know that Peacock was delivering cotton not called for by the receipts, and without their return by Curry. It would make no difference, as to balancing the numbers, what bales of cotton should have been on hand, whether Curry shipped a bale of cotton called for by a certain receipt or not. There should have been the number of bales called for by the receipts at the end of the season. The bank had no representative at the warehouse. I supposed, from the reading of the bills of lading, that the cotton was being shipped. My understanding was that the cotton was aboard the train. I did not deliver receipts to Curry until I got the bills of lading. I knew he would load cotton on the cars before surrendering the receipts, and get bills of lading and come to me, and I would give him receipts; and that was the manner I delivered receipts all the year. The only thing we required of Curry before shipping cotton was that he deliver to us the bills of lading. These receipts were brought to us by different parties, not always the person whose name appears in the receipt. The cotton represented by these receipts was paid for and these receipts delivered to us without indorse-

ment.  There has never been a bale of cotton transferred by indorsement of the receipt since I have been in Eastman, and I have handled thousands of them.  I always bought the receipt with the check attached, and charged the amount to Curry, who bought the cotton.  The checks attached to the receipts would be given to the party of whom Curry bought the cotton.  I had agreed with Curry to pay his checks when they were attached to cotton receipts.  The checks were for the full amount of the value of the cotton.  Nobody ever afterwards set up any claim to the receipts.  The party who brought the receipts to us was the owner of them.  At the time the receipts were issued, C. G. Brown was manager of Peacock & Carr's warehouse.

Edwards, vice-president of the Citizens Banking Company, testified that he saw Curry loading the cars with cotton and shipping it from the warehouse; knew the bank held cotton receipts; did not object to the cotton being delivered to Curry, nor did he as vice-president tell Peacock that he objected to his delivering the cotton to Curry; supposed that when Curry put cotton aboard the train he got a bill of lading for it; thinks it is the custom to issue a bill of lading after the cotton is loaded.  It had to be delivered by Peacock, and witness knew the cotton was being delivered to Curry, and that he was shipping; did not know that Curry was shipping cotton for which he had not taken up receipts, and did not consent for him to ship it without first taking up the receipts.  The warehousemen loaded the cotton.  Witness had no duty in the management of the affairs of the bank, and did not keep any of the books nor look after its affairs.  The bank required these receipts to go in every check that was paid for cotton.  Curry was the shipper, and transferred the bill of lading and attached to it a draft upon the consignee.  Witness thinks Peacock had every opportunity to know that Curry did not have the receipts when he loaded the cotton.  Curry could not get the cotton out of the warehouse without the knowledge of these people; and if they got the cotton out of the warehouse without these receipts, the warehousemen were obliged to know it.  Witness does not know whether any of the re-

ceipts for the 2,000 bales were delivered up before the cotton was taken out of the warehouse or not.

*Smith & Clements,* by *Hoke Smith & H. C. Peeples,* for plaintiff. *D. M. Roberts* and *DeLacy & Bishop,* for defendants.

LITTLE, J.  The Citizens Banking Company of Eastman brought an action against Peacock & Carr, warehousemen, for the recovery of sixty-seven bales of cotton, which were described in the petition, and of the alleged value of five thousand dollars.  The trial resulted in a nonsuit, and to this judgment of the court, and other rulings made in the case, the plaintiff excepted.

1.  The first exception is, that the court erred in refusing to admit in evidence three warehouse receipts, which were offered by the plaintiff as showing title to three bales of the cotton sued for.  These receipts, which were in the usual form issued by this warehouse firm, had printed on them the name of the firm, and other words and figures convenient for being filled at the warehouse before being issued.  The execution of the receipts for the other bales of the cotton sued for was admitted; but these three were objected to, because it did not appear that they were executed by the authority of the warehouse firm. There was no proof as to the identity of "J. C. D.," by whom these receipts were signed, nor that the warehouse company authorized any one to so sign receipts.  There was, in our judgment, no error committed by the court in refusing to permit the introduction of these receipts in evidence, without proof of their due execution for the warehouse firm.

2.  In their answer to the petition filed to recover the cotton, defendants in error denied that the plaintiff had any title to such cotton or any such interest therein as would entitle the plaintiff to maintain an action of trover for its recovery.  For the purpose of determining the question made, reference must be had to the evidence which the bank relied on to show title. It appears that one Curry was a cotton-buyer in the town of Eastman, and had made arrangements with the plaintiff to pay for the cotton which he might buy.  It was agreed that when Curry bought cotton, he should make check on the bank for

the amount of the purchase, and attach to it the warehouse re-ceipt showing the weight and mark of the cotton; and that the bank should retain the warehouse receipt as collateral security for the payment of the amount advanced on the check. The amount paid was debited to Curry, and when he had sold and shipped any part of such cotton, he would draw a draft on the consignee, for the amount of the purchase-money, and attach the bill of lading to the draft, and deliver it to the bank for collection, and take from the bank, in exchange, warehouse re-ceipts representing the number of bales shipped. When the draft was collected, Curry's account at the bank was credited with its proceeds, less exchange. So that the legal effect of the arrangement made between Curry and the bank was to pledge the cotton receipts as collateral to secure the payment of the money advanced to pay for the cotton. The defendants de-nied that the pledge so made put either the title to, or posses-sion of, the cotton in the bank; and this is the first question we have to determine.

By our code such a deposit of warehouse receipts is a pledge or pawn. Civil Code, § 2956. It will be noticed that this sec-tion of the code declares that delivery of the property is essen-tial to a bailment of this character. It is self-explanatory, however, on the subject of delivery, when it declares: "but promissory notes and evidences of debt, warehouse receipts, elevator receipts, bills of lading, or other commercial paper symbolic of property, may be delivered in pledge." Originally, warehouse receipts, elevator receipts, and bills of lading were not by our statute authorized to be pledged as collateral. By an act approved October 3, 1887, this section of the code, which prior to that time only authorized the pledge, in express terms, of promissory notes and evidences of debt, was amended, and warehouse receipts, elevator receipts, and bills of lading, or other commercial paper symbolic of property, were expressly made the subject of pledge. Acts 1887, p. 36. Prior to the passage of this act, this court, in the cases of the *Planters' Rice-Mill Co.* v. *Merchants National Bank,* 78 *Ga.* 574, and *National Exchange Bank* v. *Graniteville Mfg. Co.* 79 *Ga.* 22, in passing upon questions in which the legal effect of the pledge of ware-

house receipts was involved, made certain rulings which, without careful examination, would seem to decide, to some extent at least, the question here made; but when those cases are examined it will be found that no ruling was made in either of them based on similar facts; nor do the rulings made really involve the question here. Some of the dicta in the latter case could be construed as affecting the principle as to whether title passed to the pledgee by the symbolic delivery. But however this may be, the act supra directly made warehouse receipts the subject of pledge, and they therefore occupy a status not given to them by statute at the time the decisions referred to were made, and must, from the date of the passage of the act, be invested with all the incidents which attach to property pledged, not only by our code, but by the common law as well, where such has not been changed. `Some of the incidents which attach to the contract of pledge are pointed out by the code. Section 2957 declares that the pledgee is such a bona fide holder of the property as will protect him under the same circumstances as a purchaser; and section 2960 provides that, while the general property in the goods remains in the pledgor, the pledgee has a special property for the purpose of the bailment. Section 2958 makes provision for the sale of the property after the debt becomes due, for the purpose of making application of the proceeds to the debt. And all these incidents by express terms of the statute apply to warehouse receipts. It was the intention of the General Assembly, by the act referred to, to make warehouse receipts stand for the property which they represent; and the receipt being the symbol of the property, it must be held that when a warehouse receipt representing cotton is pledged, the property it represents is as much pledged as if manual delivery thereof had been made.

Prof. Schouler, in his Law of Bailments and Carriers (§ 190), speaking of transfers of bills of lading as security for debt, says: "Such transfers are firmly sustained by American courts as amounting to a pledge of the goods themselves for the pledgor's paper indebtedness, and, whether the transit were by land or sea, valid, on the score of a constructive delivery as against both the pledgee and the public. The exercise of further dominion

over the goods by such a pledgor, without his pledgee's assent, is held to confer upon a third party only a tortious possession, such as can not prevent the pledgee from recovering them." The principle is the same as to delivery of warehouse receipts. In the case of Gibson *v.* Stevens, 8 Howard (U. S.), 383, the Supreme Court of the United States held : "The delivery of the evidences of title, and the orders indorsed upon them, was equivalent, in the then situation of the property (stored in a warehouse), to the delivery of the property itself." This case was quoted approvingly in the case of Conrad *v.* Fisher (Missouri Court of Appeals), 8 L. R. A. 164, wherein Thompson, J., delivering the opinion of the court, says: "It is now the recognized law of this country that the owner of goods, or the one having the legal right to the sale or pledge of them, may invest another with the full title and constructive possession of them, by transferring to him a bill of lading or warehouse receipt which has been issued as their symbolical representative, either by the carrier or warehouseman in whose custody they are, so as to discharge the vendor's lien or his right of stoppage in transitu, if the transferee of the bill of lading or warehouse receipt receives it bona fide and for a valuable consideration." See also Lickbarrow *v.* Mason, 1 Smith's L. C. 188. Such we find to be the doctrine of the text-writers, supported by adjudicated cases; and it is plainly established now, that when warehouse receipts for cotton or other goods are delivered in pledge, the legal effect of such delivery is to put in the possession of the pledgee the property described in such receipt.

3. The form of the warehouse receipt used by the defendants in error, and which was given for the cotton sued for in this case, contained a stipulation that the cotton represented in such receipt was "subject to the presentation of this receipt only on paying customary expenses and all advances. Acts of Providence and fire excepted." This stipulation made the cotton represented by the receipt subject to the control of its bona fide holder. Such a paper, while not made negotiable by our law, is quasi-negotiable, and may pass from hand to hand by delivery, because of the fact that, by express stipulation, delivery of the cotton which it represents is made subject only to the

presentation of the receipt.  Mr. Colebrooke, in his work on Collateral Securities (§ 413), says: "The transfer for value, as collateral security, of warehouse receipts, by indorsement and delivery, or by delivery only, where such receipts are made payable to 'holder' or 'only upon the return of this receipt,' vests the legal title and possession of the property in the pledgee, and is equivalent to an actual delivery of the property." It has been held that, if the parties so intend, the delivery of the warehouse receipt without indorsement, as collateral security, transfers both title and possession of the property represented by such receipt. 17 Wis. 359; 48 Mich. 118; 8 Cal. 603. In the case of Rice v. Cutler, 17 Wis., supra, it was held that even where in the language of the statute such receipts may be transferred, the provision is regarded as permissive only, and is without effect upon the right to transfer by delivery, existing independently of the statute. And further Mr. Colebrooke says (§ 414): "The pledgee of warehouse receipts, receiving the same, with or without indorsement, as collateral upon a bona fide loan or discount of commercial paper, stands in the same privileged position as a bona fide purchaser for value of like receipts." And that "The pledgee of warehouse receipts is under no obligation to notify the warehousemen of the transfer to him of such receipts as collateral security."

4. When a warehouse receipt in the form of those which were in evidence in this case is delivered as collateral security to another person, to be held as pledge for the payment of a debt, the effect of such delivery is to constitute the warehouseman the bailee of the person receiving such receipt in pledge; and this is true although the warehouseman has no notice of the transfer. Colebrooke, Coll. Sec. § 413, and authorities cited under note 2. This is so from the nature of the contract entered into originally between the depositor and the warehouseman, and because the property passes by the transfer to the pledgee under the law merchant, independently of any statute.

5. One of the defenses insisted on by the defendants in the court below was, that the plaintiff in error had in fact received the proceeds from the sale of the cotton for which it had brought its action. The object of pledging the cotton was to

enable the pledgee, under the limitations of law, to sell the property pledged, and apply the proceeds to the payment of the debt of the pledgor.   If, therefore, the pledgee has in fact received the proceeds from the sale of the cotton pledged, then it would follow that the title of the pledgee to the cotton is extinguished, because he could recover the cotton only for the purpose of sale and application of the proceeds to his debt, and having the benefit of the proceeds, he could ask no more, although he still held the warehouse receipts.   On production in evidence of the warehouse receipt, and proof of demand and value, the plaintiff makes out a prima facie case; and if the defendant is to be relieved from his liability on the receipt which he has issued, he must show the facts entitling him to such relief.   Therefore, where he claims that the plaintiff has received the proceeds, the burden of proof is on him to show that fact in the trial of an action instituted by the pledgee against the warehouseman for the recovery of the cotton pledged. A warehouseman, when he delivers cotton deposited with him under the terms and conditions which are incorporated in the receipts put in evidence in this case, takes the risk, when he delivers such cotton without the production of the receipt, that the person to whom he delivers it has the possession of the receipt, or is rightfully entitled to it.   To free himself from liability in such a case, when it is shown that the receipt is outstanding in the hands of an innocent purchaser for value, or in the hands of a pledgee who received it as collateral to secure the payment of money, the burden of showing the facts which would relieve him from the production of the cotton called for must be borne by him.

6. By section 2960 of the Civil Code it is declared that the pawnee has a special property in the property pledged, for the purposes of the bailment, but the general property in the goods remains in the pledgor.   The purpose of the bailment being security for the payment of a debt, the method of applying it is prescribed by the statute (Civil Code, § 2958), by a sale of the property after the debt becomes due and remains unpaid.   Having then a special property in the goods for the purposes of the bailment, and the manner of applying such property to such

payment being prescribed to be by a sale of the property, actual possession so as to deliver the same to the purchaser must be in the pledgee.   When, therefore, there has been a symbolic delivery of the property in pledge, as by the delivery of a warehouse receipt given for cotton, and it being established that such transfer vests in the pledgee the possession of the cotton described in the receipt, it must follow that if the manual possession of the property represented by the receipt be held by another, the special property which the pledgee has in such property authorizes him to maintain an action of trover for its recovery.   As we have endeavored to show, the delivery of the warehouse receipt to a pledgee is the delivery of the cotton to him, and he has a right of action against the warehouseman to recover the actual possession for the purposes of the bailment; that is to say, for the purpose of selling the same and applying the proceeds to the payment of the debt.   Colebrooke, Coll. Sec. § 12; Lawson on Bailments, § 68.

7. Under the view which we entertain of the questions of law involved in the record in this case, the granting of a nonsuit by the court below was error, and the case should have been submitted to the jury for determination of the facts involved.　　　*Judgment reversed.   All the Justices concurring.*