# Wytheville.

MILLHISER MANUFACTURING Co. v. GALLEGO MILLS Co. AND
OTHERS.

June 11, 1903.

1. MANUFACTURING COMPANIES—*Mortgage—Unissued Bonds—Holders for Value—Supply Liens.*—Bonds of a manufacturing company, secured by mortgage on its real and personal property, are of no value before issue, and represent nothing; when issued, and in the hands of *bona fide* holders for value, the holders become mortgagees, and as such are expressly protected by the terms of section 2485 of the Code against claims for supplies not previously asserted.

2. WAREHOUSE—*Manufacturing Company—Elevator Company.*—A milling company which, in pursuance of charter powers, manufactures flour and meal and stores its own products on its premises, is a common law warehouse, and may issue warehouse receipts for the products so stored; and so likewise is an elevator company which receives and stores grain in bulk for its customers.

3. WAREHOUSE RECEIPTS—*Effect of Transfer—Title and Possession of Goods—Estoppel.*—The indorsement and transfer to a *bona fide* holder for value of a warehouse receipt for goods to be delivered upon order of the depositor, or upon surrender of the receipt, operates to transfer to the holder the legal title to such goods and the possession thereof, as effectually as if there were a physical delivery of the goods to a purchaser. This doctrine rests upon principles of equitable estoppel. It is immaterial that the goods are the property of the warehouseman, or that he stores only his own goods, or that they are commingled in bulk with other goods.

4. MANUFACTURING COMPANY—*Warehouse Receipts—Lien for Supplies.*—After a manufacturing company has issued and negotiated to a *bona fide* holder for value warehouse receipts for its products, the goods represented by such receipts are not "personal property of such company" within the meaning of section 2485 of the Code so as to be liable to a lien for supplies furnished the company.

Statement.

5. WAREHOUSE—*Common Law*—*Code, Chapter 82*—*Licensed Warehouses*— *Failure to License.*—Common law warehouses may still exist in this State, and may issue receipts for goods stored therein with the same effect as at common law, notwithstanding the provisions of chapter 82 of the Code and Acts amendatory thereof. These statutes establish and regulate licensed warehouses, but do not abrogate the common law with respects to receipts and certificates issued by warehouses not licensed, or whose proprietors have not complied with those statutes. The title of a *bona fide* holder for value of such receipts or certificates cannot be affected by the failure of the warehouseman to take out license as required by statute.

6. COMMON LAW—*Statutory Changes.*—The common law is not presumed to have been changed by a statute unless the statute expressly so declares.

7. WAREHOUSE RECEIPTS—*Nature and Effect*—*Bona Fide Holder*—*Lien for Supplies.*—Warehouse and storage receipts, whether issued by a warehouseman who has complied with chapter 82 of the Code or one who has not, have the nature and effect given them at common law, and the *bona fide* holder for value of such receipt has priority over a claimant asserting a lien for supplies furnished after the transfer and delivery of such receipt.

Appeal from three decrees of the Chancery Court of the city of Richmond pronounced March 13, 1897; June 27, 1899, and July 3, 1900, in a suit in chancery, wherein The Richard Grant Co. and appellants were the complainants, and the appellees were the defendants.

*Amended and Affirmed.*

The opinion states the case.

*H. R. Pollard, James Cannon, O. B. Roller & Martz,* for the appellants.

*A. W. Patterson, H. Taylor, Jr., C. U. Williams, B. T. Crump, R. L. Montague, Coke & Pickrell, C. S. Stringfellow,* and *F. McCutchen,* for the appellees.

*Wm. L. Royall,* by leave of the court, filed a brief in favor of the priority of the warehouse certificates as against the supply liens.

CARDWELL, J., delivered the opinion of the court.

The Gallego Mills Company was chartered by the Circuit Court of the city of Richmond, February 9, 1895, to carry on the business of manufacturing flour, meal, etc. Authority was given the company to purchase of C. L. Todd and Cyrus Bossieux, partners doing business under the firm name and style of "The Gallego Mills," the plant of this partnership, the stock on hand, etc., and the brick warehouse connected with "The Gallego Mills" by a bridge, and the lot upon which it stands situated northeast of the mill. To acquire the plant, the stock on hand, etc., and the warehouse, together with lot upon which it stands, authority was given to the new corporation to issue bonds to the amount of $200,000, secured by a first mortgage on the real estate, etc., of the mortgagor, of which $125,000 face value, and certain capital stock, were to be delivered to Todd and Bossieux, as the purchase price.

This new corporation organized at once under its charter, and proceeded to conduct the business, (1) of manufacturing flour, meal, etc., for sale by wholesale; and (2), as a keeper of a public warehouse for the storage of goods, wares, merchandise, etc., until in 1897, when the Richard Grant Company, a corporation, filed its original, amended and supplemental bills against the Gallego Mills Company and others, the general object of which was to enforce a lien for supplies furnished the Gallego Mills Co., ascertain all the liens upon its property, their priorities, etc., and sell the property of the defendant corporation and apply proceeds to the satisfaction of its debts, and in the meantime to preserve the property by the appointment of a receiver, etc. A receiver was appointed and proceedings taken looking to the winding up of the affairs of the defendant corporation, a sale of its assets, etc. The Millhiser Manufacturing Company and James Keister, by their respective petitions, became parties to the suit, claiming a lien under secs.

2485 and 2486 of the Code of Virginia, on the property, etc., of the Gallego Mills Co. for certain supplies furnished the defendant company, the claim of the Millhiser Company being for supplies in the shape of cloth sacks, and that of James Keister for supplies in the shape of staves.

In the conduct of its business, as a manufacturer of flour, meal, etc., which was extensive, large amounts of ready money were necessary, and the required funds could only be obtained through the banks and capitalists. Large amounts of grain were purchased by the company, which were deposited with the C. & O. Rwy. Co. in its elevator at Richmond and certificates therefor issued, and flour in large quantities from time to time sold or pledged to the banks or others furnishing the money needed by the company in the conduct of its milling business, and deposited in the company's warehouse, and receipts therefor issued to the buyer or the lender of the money, and it was the custom of the company to raise money for the prosecution of its business by transferring and delivering certificates for wheat deposited in the C. & O. Rwy. Co.'s elevator to banks or other parties who would furnish the needed funds; the effect of which certificates and receipts, as understood between the parties, was that the wheat or flour they represented should be thereafter the property of the holder of the certificate or receipt subject only to the stipulations contained therein.

This method of doing business was not peculiar to this corporation, and is and has been the common practice among all manufacturing establishments of any great size. It had been carried on by this company from its organization, and these elevator certificates and warehouse receipts were regarded and treated by the banks and others as an unquestionable basis of credit. At the time of the institution of this suit, there were in the hands of the appellees elevator certificates and warehouse receipts for large quantities of wheat and flour de-

posited as before stated, for which the holders thereof had parted with their money, and it is conceded that they did so in good faith.

It further appears that when the Gallego Mills Company was organized and acquired the milling property, it executed a mortgage upon its property to secure certain bonds, aggregating $200,000, of which $125,000 represented unpaid purchase money, and the remaining $75,000 were left in the treasury of the company unissued, and are spoken of in the record as "treasury bonds." Subsequently these "treasury bonds" were negotiated with certain banks and Holt & Co., appellees, and were held by them at the institution of this suit.

The questions raised in the court below were whether the supply lien creditors, under the statute, or the banks and others, similarly situated, had priority as to time and right in respect to the property represented by (1) the "treasury bonds," (2) the warehouse receipts, and (3) the elevator certificates, and the court held that the holders of the elevator certificates had priority over the supply lien creditors, with respect to the wheat represented by these certificates, but referred the cause to a commissioner to enquire and report whether labor and supply claimants or the holders of the "treasury bonds" and warehouse receipts (for flour) had a prior lien on the bonds and flour. The commissioner reported against the holders of the "treasury bonds" and of the warehouse receipts, and in favor of the labor and supply claimants, and upon exceptions to the report, the court overruled the commissioner in so far as he gave priority to the lien of the labor and supply claimants on the "treasury bonds," but sustained and confirmed his report, to the extent that it gave the supply lien creditors a paramount lien upon the flour represented by the warehouse receipts.

Upon an appeal by the Millhiser Manufacturing Co. and James Keister from the decrees of the lower court in respect to (1) the wheat represented by the elevator receipts, and (2)

the "treasury bonds" and by the cross error assigned under rule IX., by the banks holding the warehouse receipts for flour, all three of the questions above referred to are presented for our determination.

The case has been argued at great length and with learning and ability, though the argument has taken a much wider range than is necessary to a decision of the questions presented. It is, therefore, impossible, within proper limits, to review all the collateral positions taken, or to trace principles remotely bearing upon the questions, through the wilderness of the cases cited. Nor is it necessary.

While we do not deem it at all material, it is perhaps worthy of mention that the "treasury bonds" were issued to those now holding them prior to the furnishing of the supplies by appellants for which they assert a lien on the bonds, under the statute. It is not questioned that the bonds were acquired by their present holders in good faith and for value. In no sense whatever were those bonds ever the property of the Gallego Mills Co. Until issued they were of no value and represented nothing, and after issue they only became part of its obligations and liabilities. Had they never been issued and remained in the company's possession until after the supplies had been furnished, the supply man would have had no lien on them, as they would have been no part of the company's personal property, subject to the lien of supply creditors. When they were in fact issued and negotiated, then the holders thereof became mortgagees, and as such are expressly protected by the terms of section 2485 of the Code, as amended, inasmuch as no claim for supplies had been asserted by appellants under the statute until the bonds had been issued and transferred. We are, therefore, of opinion that the lower court was plainly right in its decision that the holders of these bonds held title thereto paramount to any lien thereon in favor of appellants.

The two remaining branches of the case involve a question

as to the proper interpretation to be given to the two statutes, the one, section 1791 of the Code, concerning warehouse receipts, and the other, section 2485, as amended February 13, 1892, Acts 1891-'2, p. 362. Pollard's Sup., p. 268, as to supply liens. Section 1791 is as follows:

"*Transfer of Receipts Issued by Licensed Warehouses.*— Warehouse or other storage receipts, with the word 'negotiable' plainly written or stamped on the face thereof, issued by any person keeping a licensed warehouse or other licensed place of storage in this State for goods, wares, merchandise, cotton, grain, flour, tobacco, lumber, iron, or other commodity stored with such person, shall be transferable by indorsement and delivery, whether the property specified in such receipt be owned by the person issuing the same or another; and any person to whom such receipt is so endorsed and delivered shall be deemed the owner of the property specified therein, so far as may be necessary to give effect to any sale to such person, or to any pledge or lien for his benefit, created or secured by such transfer, whether the receipt or indorsement be admitted to record or not, subject, however, to storage and other charges of the person keeping such place of storage."

Without setting out section 2485, as amended, and conceding for the purposes of this case that it applies to a corporation duly chartered for two or more distinct purposes, and doing business under authority of its charter, (1) as a manufacturer of flour, meal, etc., and (2) as the keeper of a public warehouse for the storing of goods and merchandise, by this statute supply creditors have a lien on all the personal property of such a corporation except that forming a part of its plant, and a lien on all the real property of the corporation, whether part of the plant or not, subject and inferior to any lien by deed of trust, mortgage, hypothecation, sale or conveyance, executed and recorded prior to the date on which the supplies were furnished, *i. e.,* a prior lien on all the property, real and

personal, *belonging to the corporation*—subject, however, to liens created by deeds or instruments in writing properly recorded prior to the date of the supplies furnished—also, upon all the personal property of the company not used in the plant, they have a prior lien; on all the real estate, whether used in the plant or not, and apparently on all the personal property used in the plant, a lien inferior to a lien by deed of trust, mortgage, etc.; but whether this lien can override and supplant in this case the right of the holders of the elevator certificates and warehouse receipts, in respect to the property represented by the certificates and receipts respectively, must depend upon the interpretation to be given to sec. 1791 of the Code, *supra.* That section and the other sections of Chapter 82 of the Code are *in pari materia,* and, therefore, the chapter is to be considered in its entirety, in order to gather the true intent of the law-makers.

Section 1792, as it originally appeared in the Code, simply provided against the issue of any warehouse or other storage receipt unless the property therein mentioned shall be actually in store, and against the issuance of receipts in duplicate. As amended by Act of 1895-'6, p. 516, Poll. Sup., p. 216, this section (1792) provides that no person shall issue any such *licensed* warehouse or other *licensed* storage receipt unless he be the keeper of a regularly *licensed* warehouse or other *licensed* place of storage in this State for goods, wares, merchandise, etc., stored with such person, and shall have paid to the Commonwealth the tax for such license, and unless the property therein mentioned be actually in store, etc.; and further providing that "it shall be the duty of such person keeping such *licensed* warehouse or *licensed* place of storage to cause to be posted prominently over the door of his place of business a sign indicating that such warehouse or place of storage is duly licensed; and such person shall also cause to be written or stamped in plain letters upon the billheads and envelopes used

by him in said business words indicating that the warehouse or place of storage kept by him is duly licensed." "Any person violating the provision of this act shall be deemed guilty of a misdemeanor, and upon conviction fined," etc.  Sec. 1793 contains a prohibition against the sale by a warehouseman or the removal of the property beyond his control without the surrender of the storage receipt therefor.  Sec. 1794 declares the delivery of grain to a warehouseman to be a bailment and not a sale, although the grain may be mixed with other grain belonging to the warehouseman or other person.  Sec. 1795 declares fraudulent removal of the property stored to be larceny; and section 1796 defines forgery of a warehouse receipt and prescribes the penalty therefor.

Now if this statute is to be construed as abrogating the common law concerning warehouse and other storage receipts, then this case is with appellants in respect to the elevator certificates and warehouse receipts, as it is not pretended that either the elevator or the warehouse is conducted as a licensed warehouse under the statute, Chapter 82, *supra.*  In other words, if the effect of this statute is to render all warehouse or other storage certificates or receipts issued by a warehouseman or others keeping a place for the storage of goods, wares, merchandise, etc., who have not complied with the provisions of sec. 1791, *et seq.,* of Chapter 82, ineffectual to pass to the holder of such certificate or receipt the legal right and title to and the possession of the property specified therein, as at common law, the title to and possession of the wheat represented by the elevator certificates and the flour represented by the warehouse receipts, in question here, remained with the Gallego Mills Co., so far as the appellants are concerned, and their supply liens by virtue of sections 2485 and 2486 of the Code, as amended, attached thereto, and as a prior lien thereon.

We give here the form of the elevator certificates, so far as material, and of the warehouse receipts in question copied into

the record; the others as agreed being of the same tenor and effect:

"Richmond Elevator, Richmond, Va., *Jan. 21, 1896.*

"Received in store from B. & O. No. 36896, eight hundred and thirty and $\frac{30}{60}$ bushels of No. 3 spring wheat, subject to the order hereon of Mr. R. H. Gray, agent R. & P., and surrender of this receipt and payment of charges.

"And it is agreed by the holder of this receipt that the grain herein mentioned may be stored with other grain of the same quality by inspection, etc. . . . at owner's risk.

"T. C. Malford, Manager;
"W. B. Waldron, Agent."

"The Gallego Mills Company, Richmond, Va.

"No. 412.    Warehouse Receipt.

"We have this day received in store for and on account of Union Bank, Richmond, Va., one hundred (100) (Patent Marked 21339) Barrels Flour, to be held subject to the order of said Bank, and to be delivered only on the surrender of this receipt.

"The Gallego Mills Company,
"C. L. Todd, President;
"H. D. Riddick, Shipping Clerk;
"Grain Receiver."

The flour represented by the warehouse receipts was, as we have seen, stored in the warehouse of the Gallego Mills Co., owned and kept by the company under authority of its charter, and the wheat represented by the elevator receipts was stored in the C. & O. elevator building in the city of Richmond, run as a station of the C. & O. Rwy. Co., the successor in title to

the property and franchises of the Louisa Railroad Company, whose charter authorized the company to have warehouses, depots, etc. So that the Gallego Mills Co. conducted a public warehouse for the storage of goods, wares and merchandise, separate and distinct from its establishment as a manufacturer of flour, meal, etc., under authority of its charter, and the C. & O. Rwy. Co., pursuant to its charter powers, conducts its elevator in the city of Richmond as a public depository—a depot or warehouse for the storage of grain committed to its keeping. The fact that the Gallego Mills Co. did not happen to store in its warehouse the goods of other merchants and manufacturers, but stored alone, as seems to have been the case, the products of the business conducted by it as a milling concern, which had been sold or pledged and transferred both as to title and possession is, as we think, wholly immaterial, and can have no bearing upon the right of the holders of the warehouse receipts for the flour in question to be delivered only on the surrender of the receipt.

When the learned chancellor below sustained the right of the holders of the elevator certificates to the wheat represented by them, the right of the holders of the warehouse receipts to the flour they represented should have been upheld. Both are to all intents and purposes warehouse receipts according to the common law, and each is an acknowledgment by the issuer that he holds the goods of the depositor, which he will deliver upon the order of the depositor or upon the surrender of the receipt. The purchaser of such a receipt, or the lender of money upon it as collateral, gets the legal title to and the possession of the goods, if it was so intended by the depositor of the goods and the issuer of the receipt when the deposit was made and the receipt issued. 2 Dan. on Neg. Inst. (5th Ed.), p. 743; *Citizens' Banking Co.* v. *Peacock, etc., infra*; *Alabama State Bank* v. *Barnes*, 82 Ala. 615, 2 South. 349 ; *Kavanagh* v. *Railroad Co.*, 78 Ga. 274, 2 S. E. 636; *McEwen* v. *R. Co.*, 33 Ind. 377, 378,

5 Am. Rep. 216; *Halliday* v. *Hamilton*, 11 Wall. 560, 20 L. Ed. 214; *Means* v. *Bank*, 146 U. S. 620, 13 Sup. Ct. 186, 36 L. Ed. 1107; *Rice* v. *Cutler*, 17 Wis. 362, 84 Am. Dec. 747; *Rosenham* v. *Batjer*, 154 Pa. 544, 25 Atl. 754; *Gibson* v. *Bank*, 11 Ohio. St. 317; *Kimberly* v. *Patchin*, 19 N. Y. 330, 75 Am. Dec. 334; *Bank* v. *Wilder*, 34 Minn. 149, 24 N. W. 699; *Fidelity Co.* v. *Roanoke Iron Co., infra.*

In *Alabama State Bank* v. *Barnes, supra*, it is said: "It may be regarded as now settled that a warehouseman having property of his own stored in his warehouse may, in the absence of statutory enactments, issue receipts therefor, and pledge the property as collateral security for his own debt by the delivery of said receipts." See also *Bank* v. *Hibbard*, 48 Mich. 118, 11 N. W. 834, 42 Am. Rep. 465; *Cockran* v. *Ripley*, 13 Bush. 495; *Parshall* v. *Eggert*, 54 N. Y. 18; *Smith* v. *Capital Co.*, 58 Pac. R. 483; *Norwegian Co.* v. *Hawthorn*, 71 Wisc. 529, 37 N. W. 825; *Broadwell* v. *Howard*, 77 Ill. 305; *Natl. Bank* v. *Wilder, supra.*

A place adapted to the reception and storage of goods and merchandise is a warehouse at common law. Bouvier's L. D. 1211.

In *Citizens' Banking Co.* v. *Peacock, et als.*, 103 Ga. 171, 29 S. E. R. 752, the form of the warehouse receipt under consideration contained a stipulation that the cotton represented was "subject to the presentation of this receipt only on paying customary expenses and all advances, acts of providence and fire excepted," and it was held that this stipulation made the cotton represented by the receipt the property and subject to the control of a *bona fide* holder of the receipt. The opinion says: "Such a paper, while not made negotiable by our law, is *quasi* negotiable, and may pass from hand to hand by delivery, because of the fact that, by express stipulation, delivery of the cotton which it represents is made subject to presentation of the receipt."

Colebrooke, in his work on Collateral Securities, quoted with approval in the case just referred to (sec. 413), says: "The transfer for value, as collateral security, of warehouse receipts, by indorsement and delivery or by delivery· only, where such receipts are made payable to 'holder' or 'only upon return of this receipt,' vests the legal title and possession of the property in the pledgee, and is equivalent to an actual delivery of the property."

Again it is said in *Citizens'· Banking Co.* v. *Peacock, et als., supra*: "When a warehouse receipt, in the form of those which were in evidence in this case, is delivered as collateral security to another person to be held as a pledge for the payment of a debt, the effect of such delivery is to constitute the warehouseman the bailee of the person receiving such receipt in pledge; and this is true, although the warehouseman has no notice of the transfer. Colebrooke, 413, and authorities cited under Note 2. This is so from the nature of the contract entered into originally between the depositor and the warehouseman, and because the property passes by the transfer to the pledgee under the law merchant independently of any statute." In that case *Rice* v. *Cutler, supra*, is cited, wherein it was held that "even where in the language of the statute such receipt may be transferred by indorsement and delivery, the provision is regarded as permissive only, and is without effect upon the right to transfer by delivery existing independently of the statute."

In the leading case of *Gibson* v. *Stevens*, 8 How. 384, 12 L. Ed. 1123, Taney, C. J., delivering the opinion of the court, said: "The transaction, therefore, being in the usual course of trade and free from all suspicion of bad faith on the part of the plaintiff, the question to be decided is, what was the legal effect of the indorsement and delivery of the warehouse documents in consideration of the advance of money he then made to McQueen & McKay! In the opinion of the court it transferred to

him the legal title and constructive possession of the property, and the warehouseman from the time of this transfer became his bailee and held the pork and flour for him. The delivery of the evidence of title and the orders· indorsed upon them was equivalent in the then situation of the property to the delivery of the property itself. This mode of transfer and delivery has been sanctioned in analagous cases by the courts of justice in England and this country, and is absolutely necessary for the purposes of commerce. . . .. Nor, as respects the legal title, can there be any distinction between the advance made by Gibson and the case of an actual purchaser, and the legal title was conveyed to him to protect his advances."

That case has been frequently cited with approval by the United States Supreme Court as well as by the courts of a number of the States, and among the cases referred to are *Means* v. *Bank,* 146 U. S. 627, 13 Sup. Ct. 186, 36 L. Ed. 1107, and *Merchants', &c. Bank* v. *Hibbard, supra.* In the last-named case, which is directly in point, it is held that "A warehouseman having property of his own in store may pass title to it by the execution and delivery of an ordinary warehouse receipt. He may also pledge it by such a receipt to secure the payment of his own indebtedness. And where the property is wheat, the pledge is not inoperative by reason of the wheat being part of a larger mass and not separated or distinguished when the receipt is given."

In the opinion by Cooley, J., it is said: "We have already said that it is conceded a warehouseman may transfer title to property in his warehouse by the delivery of the customary warehouse receipt. In such cases there is no constructive delivery of the property whereby to perfect the sale except such as is implied from the delivery of the receipt; and where the property represented is only part of a large mass as was the case here, there could not well be any other constructive delivery. But for the convenient transaction of the commerce of

the country, it has been found necessary to recognize and sanction this method of transfer, and vast quantities of grain are daily sold by means of such receipt."

That eminent jurist discussing, in the same case, the question whether a constructive transfer of possession that is recognized in the case of a sale should be held inoperative in case of an attempted pledge, says: "If a merchant may buy grain in store and receive transfer of title in a warehouse receipt, he would be very likely if he had occasion to receive grain in pledge to suppose a similar receipt to be sufficient for that purpose. No reason would occur to him why it should be otherwise, and this because there would in fact be no reason except one purely technical depending on nice legal distinction. When that is found to be the case, any proposition to establish a distinction should be rejected, decisively and without hesitation; for the laws of trade are made and exist for the protection and convenience of trade, and they should not tolerate rules which have the effect to border the chambers of commerce with legal pitfalls."

Miller, J., in *McNeil* v. *Hill*, 1 Wollworth Circuit Court Reports, at p. 97, 97 Fed. Cas. 8,914, states the law as to warehouse receipts as follows: "Instruments of this kind are *sui generis*. From long use in trade they have come to have among commercial men a well understood meaning, and the indorsement or assignment of them as absolutely transfers the general property as would a bill of sale."

The doctrine upheld by the preceding authorities, that a warehouse receipt vests in a *bona fide* purchaser of it for value, or in a *bona fide* pledgee for value, the legal title to and possession of the property represented by the receipt, rests, not upon the theory of a *symbolical delivery of the property*, but upon the principles of *equitable estoppel*, whereby one who has armed another with such indicia of title to the property that he may deceive innocent third parties and make them believe

he is the real owner, will be estopped to set up any claim of title to the property as against one who is a *bona fide* purchaser of it without notice. This doctrine was enunciated in *Wright* v. *Campbell,* 4 Burrows, 2046, and received pronounced judicial sanction in the early case of *Lickbarrow* v. *Mason,* 2 Durn. & East., p. 63 (2 Smith's L. C., 9 ed., 1045 *et seq.*) repeatedly cited with approval by text-writers as well as in the decided cases, and never criticised so far as we have been able to find. See also *McNeil* v. *Bank,* 46 N. Y. 325, 7 Am. Rep. 341, where the doctrine is elucidated and a very instructive opinion delivered.

Having considered the nature and effect of the warehouse receipts and elevator certificates involved in this case and reached the conclusion that they, like a bill of lading, at common law, represent the goods therein, and that the transfer of the ownership as well as the right of possession is made as effectually by their transfer and delivery as it can be by a physical delivery of the goods, we are brought directly to the question whether or not Chapter 82 of the Code abrogates the common law with respect to such receipts or certificates and invalidates them and all of like character where not issued by a licensed warehouse whose owner or proprietor has complied with the statute.

At an early day in England statutes were enacted which greatly enlarged the effect of such instruments, and in Virginia, by the Act of 1874 (Acts 1874, p. 233), they were made negotiable under certain rules and regulations, and in some of the other States they are negotiable by indorsement and delivery, but we have been unable to find any case holding that by reason of the statute enlarging the effect of such instruments, their *quasi* negotiability is destroyed, and that their transfer and delivery does not vest in a *bona fide* holder for value the ownership and right of possession of the goods they represent, where it is stated on the receipt that the goods stored are to be delivered "only on the surrender of this receipt" or upon the "surrender of this receipt," etc.

Section 1791 and other sections of Chapter 82 of the Code originated in the Act of April 16, 1874, *supra*, the title of which is, "An act to prescribe how hypothecation of products and commodities shall be made, and to prohibit the hypothecation of consignments except on conditions." Chapter 82 is under the head, *"Of Warehouse and Storage Receipts,"* and the title to section 1792, as amended by the Act of Feb. 27, 1896 (Acts 1895-'6, p. 516), is: *"When receipts not to be issued; duplicate receipts";* and provides that no person shall issue any such *licensed* warehouse or other *licensed* storage receipt unless he be the keeper of a regularly *licensed* warehouse or other *licensed* place of storage in this State for goods, wares, merchandise, etc., or other commodity stored with such person, and shall have duly paid to the Commonwealth the tax for such license, and unless the property therein mentioned shall be actually in store," etc.

This is all that there is in the statute which could be interpreted as abrogating the common law with respect to warehouse and other storage receipts issued by a person or corporation other than a *licensed* warehouse keeper who had complied with the provisions of the statute.

"Not merely does an old statute give place to a new one, but, where the common law and the statute differ, the common law gives place to the statute, if expressed in negative terms. And in like manner, an ancient custom may be abrogated and destroyed by the express provisions of a statute; or where inconsistent with and repugnant to its positive language. But the law and customs of England cannot be changed without an *act* of Parliament, for this, that the law of England is the inheritance of the subject, which he cannot be deprived of without his assent in Parliament.

"Statutes, however, 'are not presumed to make any alteration in the common law, further or otherwise than the act does expressly declare; therefore, in all general matters the law pre-

sumes the act did not intend to make any alteration, for, if Parliament had had that design, they would have expressed it in the act'." Broom's L. M. (7th ed.), 32-'3, and authorities cited.

In *Jackson* v. *Bradt*, 2 Caines, 169, Chancellor Kent, delivering the opinion, it was held that if a statute, without any negative words, declare, that all former deeds shall have in evidence a certain effect, "provided" such and such requisites are complied with, this does not prevent their being used as testimony in the same manner as if the act had never been passed.

Courts have held certain instruments negotiable, *"transferable by delivery,"* and "payable to such person as may from time to time be the holder," although they did not conform to the statute prescribing the qualities and incidents of commercial paper, and that to them must be applied "the principles which belong to bills of exchange and negotiable notes." *Arents* v. *Commonwealth*, 18 Gratt. 750; *Hartman* v. *Greenhow*, 102 U. S. 672, 26 L. Ed. 271; *McGahay* v. *State of Virginia*, 135 U. S. 662, 10 Sup. Ct. 972, 34 L. Ed. 304; *Poindexter* v. *Greenhow*, 114 U. S. 270, 5 Sup. Ct. 903, 962, 29 L. Ed. 185.

In *Alabama State Bank* v. *Barnes, supra*, the contention was made that as the receipt given by a warehouseman for his own cotton was not endorsed as provided by statute, it did not convey title or confer a special property or operate a constructive delivery of possession of the cotton, and the court held that under the statute as construed by former decisions, an indorsement of the receipt was necessary to convey the legal title, but the opinion proceeds: "The section is enabling, and was specially designed to provide the mode, in respect to such documents, of passing the legal title, so as to enable the real owner to prosecute an action thereon in his own name. So far as it relates to the passing of the title by the delivery of warehouse receipts and similar documents, the statute is an innovation

on the mercantile law, and will not be construed as abrogating or modifying it, further than is expressed, or is absolutely required to effectuate the purposes. By section 6 of the act . . . being the other statute relied on, warehouse receipts given for cotton, *may* be transferred by indorsement; and any person, to whom it may be so transferred, shall be deemed and taken to be the owner of the property, so far as to give validity to any pledge, lien, or transfer, made or created by such person; and no cotton shall be delivered except on surrender and cancellation of the original receipt, or the indorsement thereon of the delivery in case of partial delivery. . . . This statute does not imperatively require indorsement. The intention is to protect the warehousemen against a mistake or wrongful delivery, and to protect the holder for value of such *indorsed receipts* against latent equities and rights. The statute, being permissive, does not prevent the passing of title, and delivery of possession, in any mode previously effectual. . . ."

Certain sections of the Code, as amended from time to time, prescribe the mode of applying for license to transact business in this State, the amount to be paid as a condition precedent to the right to transact a business requiring a license, and the punishment for conducting such business without a license, but we know of no principle of law which invalidates negotiable paper in the hands of a *bona fide* holder, merely because it was issued by a person or corporation in the conduct of a business without conforming to the provisions of the statutes prescribing the license necessary as a condition precedent to the transaction of the business and the manner in which it is to be conducted; or that renders ineffectual and void the title to property which such person or corporation, so in default, may have sold and delivered to innocent persons. If such person or corporation has so offended against the license laws, it is a matter between the offender and the Commonwealth, punishment for which is prescribed, but innocent persons who may

have dealt with the offender cannot be made to suffer because of his dereliction.

In *Eastern B. & L. Ass'n* v. *Snyder*, 98 Va. 710, 37 S. E. 298, this court held: "Although an act of Assembly makes it a misdemeanor for an agent, officer, or employee of certain foreign corporations to do business in this State, without complying with the provisions of the act, contracts made with such corporations in violation of such act will not be declared void, but will be enforced, in the absence of any evidence of intention on the part of the Legislature that such contracts should be void."

Our conclusion upon this branch of the case is, that the holders of the warehouse receipts and elevator certificates took by the transfer and delivery of the receipts or certificates the legal right to and possession of the property they respectively represent, the Gallego Mills Co. retaining but an equitable interest in the surplus, if any remain after satisfying the claims of such holders; and the only remaining question is, do the supply lien claims asserted by appellants under sections 2485 and 2486, as amended, override the right to and possession of the property represented by the receipts and certificates and vested in the appellees as the holders thereof?

It will not be contended that the registry laws of the State have any application to a sale and delivery of personal property, and the question of "priority" can only arise between claimants asserting a lien upon the property of their debtor.

It is not liens that the appellees are asserting upon the flour and wheat in question, but the legal *title*, the right of property made complete by possession and for value in due course of trade.

In *Va. Del. Co.* v. *Crozer Iron Co.*, 90 Va. 126, 17 S. E. 806, 44 Am. St. Rep. 893, cited for appellants, the controversy was between "supply creditors" and mortgage bondholders of the Roanoke Rolling Mills Co., and the only point decided of interest here, or having any bearing on the case in hand, is that

sec. 2485 of the Code, as originally enacted, was not contrary to Amendment 14 to the Constitution of the United States as being special and class legislation. The correctness of that decision we have no occasion to question.

In *Fidelity Ins. Tr. & S. Dep. Co.* v. *Roanoke I. Co.*, 81 Fed. Rep. 439, sec. 2485, *supra,* as amended (Acts 1891-'2), came under review of the Circuit Court of the United States for the Western District of Virginia. In that case, Crocker Bros., iron-brokers of New York, made advances upon iron, manufactured by the iron company, which iron was marked and stored in the name of Crocker Bros. upon a lot in Roanoke. Certain creditors of the iron company asserted a lien upon this iron for supplies under sections 2485 and 2486 of the Code, and the question was directly presented whether this iron was a part of the personal property of the Roanoke Iron Co. "other than that forming a part of its plant," and as such subject to a lien in favor of the supply claimants. And while accepting as a correct interpretation the view taken in *Va. Del. Co.* v. *Crozer I. Co., supra,* that section 2485 did not contravene the Fourteenth Amendment to the Constitution of the United States as special or class legislation, the opinion by Simonton, J., concurred in by Paul, J., says: "It is evident, from the reason of the thing, and from the words of the statute, that no lien can be acquired by any person furnishing supplies until he has furnished the supplies, and then the lien can only attach on the property at the time and thereafter the property of the company. If, therefore, this property ceased to be the property of the Roanoke Iron Co. before the supplies were furnished, clearly there is no lien. This iron was transferred from the possession of the Roanoke Iron Co. and delivered to Crocker Bros., with a bill of lading, which was a muniment of title. *Means* v. *Bank*, 146 U. S. 627, 13 Sup. Ct. 186, 36 L. Ed. 1107. Thereafter the iron passed to them. Under the terms of the contract appearing in the letter quoted above, no pro-

vision was made for the return of the iron in specie, in whole or in part, to the iron company. It was to be held by Crocker Bros. to be sold by them, to be kept in their actual possession, and so ready for delivery. The first proceeds of the sale were to go to their advances; then all charges were to be deducted; and, after an account for these was made up, then the iron company had a right to the net balance, if any. Even were this the ordinary case of a consignment to a factor, selling under a *del credere* commission, the title to the iron would have passed to Crocker Bros., and out of the iron company. . . . . But in the present case the iron was delivered to Crocker Bros. for the purpose of obtaining a loan of money. It was delivered with the formality necessary for the passage of the legal as well as the beneficial title to Crocker Bros. True, sales of it were to follow, not, however, under the direction of and for the benefit of the Roanoke Iron Co., but under the control and direction of, and to reimburse, Crocker Bros. Over these sales no control whatever was reserved to the iron company. There is some ambiguity in the contract upon the question whether Crocker Bros. could look to any other means of reimbursement than these sales. What of the property then was left in the Roanoke Iron Co? It had the right to an account from Crocker Bros., and on such account a demand for the balance of money appearing due thereon, the balance, a result after reimbursing the loans and payment of expenses. That is the only interest the iron company had in the transaction."

There was another branch of that case in which the controversy was between the Phil. Warehouse Co., asserting a lien on several thousand tons of pig iron and muck-bar, of the product of the Roanoke Iron Co., and "supply creditors," the former claiming a prior lien on the iron for advances or loans to the iron company under a general contract, but it was held that the "supply creditors" had the prior lien, because the Phil. Warehouse Co. did not have the legal title to and posses-

sion of the property before the supply liens attached, the possession being with the iron company, with a reserved right in its contract with the Warehouse Co. to sell the iron at will, provided only that it replaced the iron sold from time to time with other iron of like quality and quantity. This was properly regarded as a mere contract for the loan of money secured by a lien on personal property and not as a sale and delivery of the property.

It is obvious that the decision of the court in the first branch of the case, to the effect that Crocker Bros., by virtue of the bill of lading or storage receipt they held, had title to the iron it represented superior to any lien the supply creditors had under the statute, does not rest upon compliance with the provisions of Chapter 82 of the Code, *supra,* as to licensed warehouses, etc., but upon the common law validity and effect of bills of lading, warehouse and other storage receipts, upholding the doctrine that the *bona fide* transfer and delivery for value of such an instrument vests in the holder thereof the legal title to and possession of the property the instrument represents, and it could not thereafter be made subject to a lien in favor of supply claimants or attaching creditors.

While it is doubtless true, as claimed in the argument of the case for appellants, that in the enactment of the labor and supply lien statute under consideration, the Legislature had in view the two-fold purpose: First, to "increase the industries of the State, develop its resources, and add to its wealth and prosperity" by fostering and encouraging corporate enterprises, and affording producing companies a source of credit whereby they might obtain the labor and raw material necessary to the operation of their plants, without which labor and supplies such companies would be unable to commence their operations; and second, to "guard property rights of other individuals and corporations" who should be willing to furnish their supplies on credit; will it be contended that a construction of the statute

which would allow a supply man to file his claim in the clerk's office after the title to property has passed to a purchaser or a lender of money to a manufacturing company, as in the case at bar, and permit the claim thus filed to reach back and take from the purchaser or the lender of money property that had already become his, would be in furtherance of or even consonant with the purposes of the statute? Such a construction of the statute would be disastrous to the laborer, the supply man, the manufacturer and others conducting industrial enterprises in this State alike, as doubtless many of the manufacturing plants and other industries employing labor and daily purchasing supplies would be forced to close their doors, since, it may be said as a matter of common knowledge, many of them have only a moderate capital and do business chiefly by borrowing money of banks and capitalists upon warehouse and other storage receipts representing the products of the manufacturing concern or other personal property not forming a part of the plant, as a basis of credit. Such receipts, as we have seen, are valid at common law as collateral for loans, and heretofore have served as a basis of credit, enabling manufacturing concerns to increase their business far beyond what they could do if left to borrow upon its credit only.

It is of the highest importance, as has often been repeated by law writers and the highest courts of both England and America, to protect commercial credit, and this can only be done where commercial paper is held inviolable in the hands of *bona fide* holders. It has also often been repeated that courts should be especially careful not to throw doubt upon mercantile usages and the customs of business men.

In *Lickbarrow* v. *Mason, supra,* Buller, J., after remarking that he did not think the case open to any arguments of policy or convenience, continued: "But if it should be thought so, I beg leave to say, that *in all mercantile transactions, one great point to be kept uniformly in view is, to make the circulation*

*and negotiation of property as quick, as easy, and as certain as possible.*"

Until the Legislature in plain and unmistakable terms abrogates the common law with respect to warehouse and other storage receipts, such receipts, whether issued by a warehouseman complying with the provisions of Chap. 82 of the Code or not, are to be regarded as having the nature and effect given them at common law, viz., that a *bona fide* holder for value of such a receipt, like a holder of a bill of lading, takes the same title to the goods the instrument represents as if the goods themselves had been actually delivered to him, and this is so, whether the transfer and delivery of the instrument be a sale or pledge as a collateral for a loan of money.

Without legislative enactment plainly expressing an intention to abrogate the common law with respect to the warehouse receipts and elevator certificates involved in this case, it is not within the power of the courts to take from them the nature and effect they are regarded as having at common law.

We regard the statute, Chap. 82 of the Code, *supra*, as merely declaratory of the common law as applied to *licensed* warehouses under that statute, adding that such provisions as were deemed essential for the better protection of the holders of such receipts, not a sentence or a word even of negation of the common law being contained in the statute.

Upon the whole case, we are of opinion that the only error committed by the lower court in its decrees appealed from lies in the decree of June 27, 1899, overruling the exceptions of appellees, the Union Bank and Savings Bank, of Richmond, Va., to so much of the report of Commissioner Guy of February 24, 1899, as gives priority in point of time and right to the supply claims filed in the cause by appellants over the warehouse certificates for flour which were issued by the Gallego Mills Co. in its character of warehouseman and not as manufacturer and held by appellees, the Union Bank and Savings

Bank of Richmond, Va.; therefore, said decree of June 27, 1899, will be in this respect amended, and as amended it, as well as the other decrees appealed from, will be affirmed.

The order was as follows:

The court is of opinion, for reasons stated in writing and filed with the record, that the only error committed by the said Chancery Court in its decrees appealed from lies in the decree of June 27, 1899, overruling the exceptions of the appellees, the Union Bank of Richmond and the Savings Bank of Richmond, Virginia, to so much of the report of Commissioner Guy of February 24, 1899, as gives priority in point of time and right to the supply claims of appellants filed in the cause, over the warehouse receipts for flour which were issued by the Gallego Mills Co. in its character of warehouseman and not in its character as manufacturer, and held by said appellees; it is, therefore, decreed and ordered that the said decree of June 27, 1899, be amended in the particular above mentioned, so as to declare, in accordance with the views expressed in the opinion, that the Union Bank and the Savings Bank of Richmond, Va., take priority in point of time and right to the flour represented by said warehouse receipts over the said supply claims of appellants, and as amended that said decree as well as the other decrees appealed from be affirmed, and that the appellants pay to the appellees thirty dollars damages and also their costs by them about their defence herein expended.

Which is ordered to be entered in the order book here, and forthwith certified to the clerk of this court at Richmond, who will enter the same in the order book there and certify it to the said Chancery Court of the city of Richmond.

*Affirmed.*