# Staunton.

## S. H. HAWES AND OTHERS v. WM. R. TRIGG CO. AND OTHERS.

### September 9, 1909.

1. ASSIGNMENT—*Hypothecation.*—If a shipbuilding company deposits with a bank, as a security for loans, a contract with the United States government for the construction of a vessel, and executes to the bank a power of attorney authorizing the bank to collect all payments made by the government under said contract, and, on the faith of such deposit and power of attorney, the bank makes loans to said company, this transaction constitutes, under the laws of this State, a valid assignment or hypothecation of said contract with the government.

2. ASSIGNMENTS—*Equitable Assignments.*—Words which show an intention of transferring or appropriating a chose in action to or for the use of another, if based upon a valuable consideration, will, in contemplation of a court of equity, operate as an assignment.

3. ASSIGNMENTS—*Validity—Claims Against Federal Government—Sec. 3477 Revised Statutes.*—The object of section 3477 of the Revised Statutes of the United States, declaring void assignments of claims against the government except upon very restricted conditions, was to protect the government, and not the claimant, and to prevent frauds upon the treasury. Such transfers may be disregarded by the government, but may be made in the legitimate course of business, in good faith, to secure an honest debt. A transfer of a claim against the United States government, though not made in accordance with section 3477 of the Revised Statutes is valid, and will be enforced where the government has voluntarily paid the money due by it into a State court to be disposed of in accordance with the rights of the parties as ascertained by that court.

4. ASSIGNMENTS—*Priority—Liens for Labor and Supplies.*—A valid assignment of a chose in action made by a manufacturing company is superior to liens for labor and supplies (under section 2485 of the Code) furnished more than two years thereafter.

5. CONTRACTS—*Existing Laws Part of Contracts.*—The laws which subsist at the time and place of making a contract, and where it is

to be performed, enter into and form a part of it, as if they were expressly referred to or incorporated in its terms. This principle embraces alike those which affect its validity, construction, discharge and enforcement.

6. UNITED STATES—*Contracts—Construction.*—A contract between the United States government and a citizen or corporation for the building of a vessel for the use of the government or any department thereof differs in no essential features from a contract between two citizens, or between an individual citizen and a corporation. The rules of construction are the same in either case.

7. SHIPPING—*Construction of Vessel—Delivery—Passing Title.*—The right of the United States government to reject a vessel, or to annul the contract under which it was to be built, is wholly inconsistent with the idea that title had previously passed to the government, notwithstanding the fact that the contract provided for inspection by the government, payment by instalments as the work progressed, and that all parts paid for under the system of partial payments should become thereby the sole property of the United States.

8. SHIPPING—*Construction of Vessel—Government Contracts—Partial Payments—Passing Title—Supply Liens—Code, Section* 2485. Under a government contract with a manufacturing company for the construction of a vessel containing such provisions as are mentioned in the last paragraph above and providing for indemnity against loss of partial payments made, an uncompleted vessel in the hands of the company, upon which partial payments have been made, is not the property of the United States, but of the company, and is subject to the prior lien of supply creditors under section 2485 of the Code. The company could not avoid this lien, and the government cannot acquire any greater rights than the company had.

9. SHIPPING—*Construction of Vessel—Government Contract—Passing Title—Lien for Supplies—Code, Section* 2485.—If, under a contract between a manufacturing company and the government of the United States for the construction of a vessel, the government be considered as taking over the ownership of the vessel as payments therefor are made, the title passes subject to existing liens and encumbrances thereon; and if it be merely intended to provide for a lien on the vessel for money advanced in aid of its construction and equipment, whatever lien or liens the government acquires under the contract are *inferior* to the rights secured to the supply lien creditors of the manufacturing company under section 2485 of the Code.

10. CONTRACTS—*Construction—Opinion of Party—Rights of Third Persons.*—The mere opinion of the late vice-president of an in-

solvent manufacturing company as to whether a vessel being built by his company, or any part thereof, under the contract for its construction, became the property of the party for whom it was being built, and at what time, or at what stage of its construction, is no part of the contract, and can have no weight in its construction.

11. SHIPPING—*Construction of Vessel—Inspection—Payment of Installments—Passing Title.*—The title to a vessel to be built does not pass before completion merely because the contract provides for inspection by the intended purchaser and for the payment of installments as the work progresses.

12. SALES—*Passing of Title.*—When a contract is made for the purchase of an article hereafter to be delivered and paid for, so long as any act remains to be done by the vendor in order to put it into a state of readiness for delivery, the property does not pass to the buyer, but still remains at the risk of the seller.

13. SHIPPING—*Construction of Vessel—Completion and Delivery—Passing of Title.*—If in a contract for the construction of a vessel the parties intended that certain parts of the vessel should pass to the vendee as the work progressed and was paid for, it would have been easy for them to have so provided in the contract in express terms; but where the contract contains terms and stipulations wholly inconsistent with any such an intention, the general rule of law that no property in the chattel passes to the vendee till the chattel is completed and delivered, should and must prevail.

14. STATUTES—*Joint Resolutions.*—The difference between an act of Congress and a joint resolution of the same body is that the former governs all persons under the jurisdiction of Congress, while the latter is but a rule for the guidance of the agents and servants of the government.

15. MARITIME LIENS—*Contract Lien—Lien for Supplies—Code, Section 2485.*—A lien for supplies furnished to a manufacturing company, perfected under section 2485 of the Code, and attaching to a vessel in process of building for the United States government, and before the government has acquired possession thereof, is superior to a contractual lien of the government for installments paid under a contract, reserving twenty-five *per cent.* on all payments, and requiring an indemnifying bond with good security, conditioned for the construction of the vessel according to contract, and to pay all persons supplying labor or materials in the prosecution of the work. The provisions of the contract indicate that the government contracted with reference to the statutory lien, and in subordination thereto.

16. Maritime Liens—*Installment Payments—Collateral Security—Lien for Supplies—Priority—Code, Section* 2485.—Where the only lien which the United States government can assert to a vessel in course of construction by a manufacturing company is that of a collateral security for installment payments made during construction, such lien is inferior and subordinate to the lien given by section 2485 of the Code to persons furnishing supplies to the company for the construction of the vessel.

17. United States—*Contracts—Laws of State—Imputed Knowledge.* When the United States government contracts with a manufacturing company in this State to build a vessel, it is charged with knowledge of the law of this State which gives to those furnishing supplies to the company a prior lien on its property not constituting a part of its plant.

18. Contracts—*Construction of Parties—Statutory Rights of Creditors*—The construction placed by the parties upon a contract for the construction of a vessel by a manufacturing company cannot affect the statutory rights of the creditors of the company, as the statute necessarily enters into and forms a part of the contract.

19. Shipping—*Construction of Vessel—Title and Possession—Supply Liens—Demands of Creditors.*—When the title and possession of a vessel which a manufacturing company in this State is constructing for a purchaser have at all times been in the company, and were so at the time the assets of the company were placed in the hands of a receiver appointed in insolvency proceedings, the vessel is liable to the liens of persons furnishing supplies to the company, and to the demands of the general creditors of the company.

Appeal from a decree of the Chancery Court of the city of Richmond. From a decree overruling exceptions of certain creditors to a commissioner's report, the creditors appeal.

*Reversed.*

The opinon states the case.

*George Bryan,* for the First National Bank.

*Munford, Hunton, Williams & Anderson, R. G. Bickford* and *Floyd Hughes,* for the other appellants.

*Coke & Pickerel, L. L. Lewis,* and *Francis L. Smith,* for the appellees.

KEITH, P:

The William R. Trigg Company, a manufacturing corporation organized under the laws of this State, and engaged in the construction, building and equipment of ships, boats and vessels, on June 1, 1901, executed a deed of trust to the Commercial Trust Company of Philadelphia, as trustee, covering its plant and including all its machinery, fixtures and tools, together with all corporate rights, privileges and franchises, and on June 14, 1902, another deed of trust to the Richmond Trust and Safe Deposit Company to secure large issues of its bonds. It contracted also large debts to its employees and for supplies and material; and, having become greatly embarrassed, S. H. Hawes & Co., in December, 1902, filed their bill, setting forth its default in the payment of interest upon the bonds secured by the deeds of trust, averring its heavy indebtedness to banks and individuals upon promissory notes and open accounts, its total insolvency, and praying for the appointment of a receiver to take charge of its assets and to finish certain uncompleted contracts theretofore entered into by it.

Under this bill such proceedings were had that a receiver was appointed, and the cause was referred to a commissioner to state an account showing the property of the company and its value, the debts due by it, the liens and their priorities. *Bank* v. *Trigg Co.,* 106 Va. 327, 56 S. E. 158.

The question now to be disposed of grows out of the following facts: The Trigg Company, appellee, on the 20th of April, 1900, contracted with the United States government for the construction of revenue cutters Nos. 7 and 8, known as the Tuscarora and the Mohawk. Certain payments were to be made as the work progressed, but not less than twenty-five *per cent.* of the contract price was to be reserved by the government until the completion and final acceptance of the vessels. The payments so reserved are known in the record as the "Reserved

Claims." There was no provision in the contract itself prohibiting its assignment.

The Trigg Company applied to the First National Bank of Richmond, Va., for loans to enable it to execute this contract, and received $25,000 on April 26, 1900, filing its contract with the bank, but making at that time no written assignment. On May 11, 1900, the board of directors of the company passed a resolution authorizing the execution of a power of attorney to the bank to collect all payments under its contracts with the government for the construction of the revenue cutters. This power of attorney was duly executed on that day, and was sent by mail to the secretary of the treasury on May 12, 1900.

Other loans from the bank were negotiated by the Trigg Company upon the faith of the contracts with the United States government for the construction of the two cutters; so that the debt due to the bank was in the end represented by three notes, one of April 29, 1900, for $5,070, subject to a credit of $3,034 as of the 30th day of September, 1902; a note of October 16, 1900, for $25,000, and a second note of October 16, 1900, for a like amount.

The Tuscarora was completed, accepted and paid for by the government, and makes no figure in this case. The Mohawk was completed after the appointment of the receiver; and on May 16, 1904, the sum of $26,705.35 was paid by the government into court to the credit of this cause in full settlement of the amount due to the Trigg Company for the construction of that vessel.

In obedience to the decree of the chancery court the commissioner returned his report, from which it appears that many liens for supplies, material and labor were perfected and filed against the Mohawk. None of them are of an earlier date than December, 1902, while the First National Bank of Richmond claims under assignments none of which are later than October, 1900.

The commissioner reported in favor of the supply and labor liens, and to that report the bank excepted, as follows:

"First. Because said commissioner finds that the assignment by said W. R. Trigg Company to said bank of its, the said Trigg Company's, claim against the United States, arising out of its contract to build for said United States the revenue cutter "Mohawk," and the power of attorney to said bank to collect the reserve held to await the completion of said cutter, are void under section 3477, Revised Statutes of the United States; and even if not so void, the general claim of said bank, as well as said assignment and power of attorney are subordinate to all liens duly acquired for labor and supplies furnished the said W. R. Trigg Company under the terms of the Virginia statute, Code of Virginia, section 2485.

"Second. Because the findings of said commissioner sustain the constitutionality of the labor and supply lien law of Virginia, whereas said law is in conflict with section 1 of Article Fourteen of the Constitution of the United States, and with the Constitution of Virginia.

"Third. Because said commissioner finds that the said W. R. Trigg Company is a 'manufacturing company' within the meaning and operation of said Virginia labor and supply lien statute, whereas he should have found that said statute did not apply to such a company."

The second and third exceptions are disposed of by the opinion of this court in *Bank* v. *Trigg Co., supra,* where the constitutionality of section 2485 was maintained; the Trigg Company was held to be a manufacturing company, within the meaning of that section; and the liens for labor and supplies were sustained; but the decree appealed from, in that case, reserved for future consideration "all questions as to the validity or priority of any claim or lien of any party to the cause, so far as such claim or lien exists in relation to any property of the defendant corporation other than the real estate conveyed in said two mortgages and the rights appurtenant thereto, and the

personal property forming a part of its plant  . . .  and all questions as to the fund or funds upon or against which the amounts herein ordered to be paid on account of labor liens or mechanics' liens established in this cause shall be eventually charged."

The precise question, therefore, now to be decided is as to the priority of right between the First National Bank, claiming under the assignments above referred to, and the subsequent liens for labor and supplies.

As we have observed, the validity of the liens was established in *Bank* v. *Trigg Co., supra,* and must prevail, unless the bank, claiming under the assignments, shall be found to have the older and the better right.

We are of opinion that the transaction between the bank and the Trigg Company by which the contracts with the United States government were filed with the bank and a power of attorney was executed by the Trigg Company, authorizing the bank to collect all payments under its contracts with the government for the construction of the revenue cutters, on the faith of which the bank made loans to the Trigg Company, constituted under the laws of this State, valid assignments or hypothecations of those contracts. *Didier* v. *Patterson,* 93 Va. 534, 25 S. E. 661; *Building Association* v. *Coleman,* 94 Va. 433, 26 S. E. 843; *Hicks* v. *Roanoke Brick Co.,* 94 Va. 741, 27 S. E. 596; *Switzer* v. *Noffsinger,* 82 Va. 518; *Mack Mfg. Co.* v. *Smoot,* 102 Va. 724, 47 S. E. 859.

"Words which show an intention of transferring or appropriating a chose in action to or for the use of another, if based upon a valuable consideration, will, in contemplation of a court of equity, operate as an assignment." *Tatum* v. *Ballard,* 94 Va. 370, 26 S. E. 871.

We think it plain, therefore, that the dealing between the bank and the Trigg Company constituted an assignment, valid under Virginia law, and if the right of the bank is to be de-

feated it is by virtue of section 3477 of the Revised Statutes. of the United States, which is as follows:

"All transfers and assignments made of any claim upon the United States, or of any part or share thereof, or interest therein, whether absolute or conditional, and whatever may be the consideration therefor, and all powers of attorney, orders,. or other authorities for receiving payment of any such claim, or of any part or share thereof, shall be absolutely null and void,. unless they are freely made and executed in the presence of at least two attesting witnesses after the allowance of such a claim, the ascertainment of the amount due, and the issuing of a warrant for the payment thereof. Such transfer, assign-ments, and powers of attorney, must recite the warrant for payment, and must be acknowledged by the person making them, before an officer having authority to take acknowledg-ments of deeds, and shall be certified by the officer; and it must appear by the certificate that the officer, at the time of the acknowledgment, read and fully explain the transfer, assign-ment, or warrant of attorney to the person acknowledging the same."

After consideration of this statute and numerous decisions of the Supreme Court of the United States, which he discusses in his very instructive report, the commissioner in chancery was of opinion that the assignment to the bank was void, and his findings was sustained by the decree of the chancery court.

It is admitted that the assignment relied upon by the bank is not in accordance with the terms of section 3477. The con-tention of the bank is, that the act was passed, as its preamble states, to prevent frauds upon the treasury of the United States, and that by a proper construction it avoids all transfers and assignments of claims upon the United States at the option and election of the government of the United States; but that, in this case, the government having seen fit to deposit the amount due upon its contract with the receiver of the court, and having received a full acquittance of all claims and demands growing

out of the contracts which were assigned to the bank, has washed its hands of the whole transaction and left the rights of the parties to be ascertained and decided in accordance with the laws of the State, unaffected by section 3477 of the Revised Statutes, the final analysis of the position of the bank being as follows: The transaction between the bank and the Trigg Company is valid as an assignment between the parties; it was made in the legitimate course of business, in good faith, to secure an honest debt, is opposed to no public policy, and is not within the mischief which was sought to be remedied by section 3477.

The language of that section, if construed literally, would annul all transfers and assignments; but the supreme court has held in numerous cases that such was not its effect. It does not apply to transfers of title by operation of law, as, for example, the passing of claims to heirs, devisees or assignees in bankruptcy (*Erwin* v. *U. S.*, 97 U. S. 392, 24 L. Ed. 1065), but only to voluntary assignments of demands against the government; nor does it include a voluntary assignment made by an insolvent of all his effects for the benefit of his creditors (*Goodman* v. *Niblack*, 102 U. S. 556, 27 L. Ed. 229); and in the latter case the court said, that a careful examination of the entire statute leaves no doubt that its sole purpose was to protect the government and not the parties to the assignment.

In *Bailey* v. *United States*, 109 U. S. 432, 27 L. Ed. 988, 3 Sup. Ct. 272, Mr. Justice Harlan said, that the statute in question is not to be interpreted according to the literal acceptation of the words used; and further on in the opinion says, that "A mere power of attorney given before the warrant is issued—so long at least as it is unexecuted—may undoubtedly be treated by the claimant as absolutely null and void in any contest between him and his·attorney in fact. And it may be so regarded by the officers of the government whose duty it is to adjust the claim and issue a warrant for its account. But if those officers choose to make payment to the person whom the claimant, by formal power of attorney, has accredited to them

as authorized to receive payment, the claimant cannot be permitted to make his own disregard of the statute the basis for impeaching the settlement had with his agent."

In *Price* v. *Forrest,* 173 U. S. 410, 43 L. Ed. 749, 19 Sup. Ct. 434, the facts were as follows: Price, a fiscal agent of the United States, advanced $75,000 to his successor for public uses. This money not being returned, Price asserted claim against the government. In 1857 Forrest got judgment against Price, and in 1874 Forrest's widow brought suit to enforce this judgment. In 1891 Congress passed an act for the relief of Price, and in 1892 $76,204.08 was awarded him. A portion of this money was actually paid, and Forrest's widow then obtained a decree requiring Price to deliver government drafts for the balance to a receiver. In consequence of this suit, the government officials held back enough to satisfy the judgment of Forrest against Price pending the litigation in the State courts. The State court held that it had jurisdiction under the laws of the State, and as between the parties before it, to put into the hands of its receiver any chose in action of whatever nature belonging to Price and of which he had possession or control. Upon these facts, Mr. Justice Harlan, delivering the opinion, said: "While the present case differs from any former case in its facts, we think that the principle announced in *Erwin* v. *United States,* and *Goodman* v. *Niblack* justified the conclusion reached by the State court. That court held that it had jurisdiction under the laws of the State, and as between the parties before it, to put into the hands of its receiver any chose in action of whatever nature belonging to Price and of which he had possession or control. The receiver did not obtain from Price in his lifetime an assignment of his claim against the United States. But having full jurisdiction over him the court adjudged that as between Price and the plaintiffs who sued him, the claim should not be disposed of by him to the injury of his creditors, but should be placed in the hands of the receiver subject to such disposition as the court might de-

termine as between the parties before it and as was consistent
with law. The suit in which the receiver was appointed was,
of course, primarily for the purpose of securing the payment
of the judgment obtained by Samuel Forrest in his lifetime
against Rodman M. Price. But that fact does not distinguish
the case in principle from *Goodman* v. *Niblack;* for the trans-
fer in question to the receiver was the act of law, and what-
ever remained, whether of property or money, in his hands
after satisfying the judgment and the taxes, costs, or expenses
of the receivership as might be ordered by the court, would
be held by him as trustee for those entitled thereto, and his
duty would be to pay such balance into court to the credit of
the cause, to be there disposed of according to law.   .   .   .

"As this court has said, the object of Congress by 3477 was
to protect the government, and not the claimant, and to prevent
frauds upon the treasury. There was no purpose to aid those
who had claims for money against the United States in disre-
garding the just demands of their creditors. We perceive noth-
ing in the words or object of the statute that prevents any
court of competent jurisdiction as to subject matter and parties
from making such orders as may be necessary or appropriate
to prevent one who has a claim for money against the govern-
ment from withdrawing the proceeds of such claim from the
reach of his creditors; provided, such orders do not interfere
with the examination and allowance or rejection of such claim
by the proper officers of the government, nor in any wise ob-
struct any action such officers may legally take under the stat-
utes relating to the payment of claims against the United
States.   .   .   .

"It only remains to say touching this part of the case, that
if section 3477 does not embrace the passing or transfer of
claims to heirs, devisees, or assignees in bankruptcy, as held
in *Erwin* v. *United States,* nor a voluntary assignment by a
debtor of his effects for the benefit of his creditors, as held in
*Goodman* v. *Niblack,* it is difficult to see how an order of a ju-

dicial tribunal having jurisdiction of the parties, appointing a receiver of a claim against the government and ordering the claimant to assign it to such receiver to be held subject to the order of court for the benefit of those entitled thereto, can be regarded as prohibited by that section."

It will be observed that in *Price* v. *Forrest* the fund came under the control of the State court by force of its decree appointing a receiver and requiring the debtor, Price, to whom the claim from the United States Government was due, to make an assignment to the receiver; and yet that was held not to be within the mischief sought to be remedied by section 3477, that such an order would not interfere with the examination and allowance or rejection of such claim by the proper officers of the government, or in any wise obstruct any action such officers might legally take under the statutes relating to the payment of claims against the United States; *a fortiori* is the case not within the mischief sought to be remedied by section 3477 when the government, of its own accord, comes forward and by its voluntary act places within the custody of the State court the fund in controversy, receives a full acquittance of its obligations under the contract, and leaves the fund to be disposed of in accordance with the rights of the parties as ascertained by the courts of the State.

The case of *York* v. *Conde,* 147 N. Y. 486, 42 N. E. 193, is strikingly analogous in many of its features to the case under consideration. Witherby & Gaffney were contractors with the United States for building barracks at Sackett's Harbor. York & Starkweather furnished to the contractors lumber and material to the amount of $3,000, to be used in the construction. During the progress of the work and before its completion in March, 1890, Witherby & Gaffney made a written assignment to York & Starkweather of $3,000 of the money due and to become due to them from the government to be applied on their indebtedness to the assignees for materials so furnished, and authorized the disbursing agent of the government, through

whom the payments on the contracts were made, to pay to the assignees $500 from the next estimate thereafter, and $2,500 on the completion of the contract and when the balance coming to the assignors should become payable to them. Witherby & Gaffney paid assignees $5,000, but no more. On May 15, 1890, the contract having been completed, the disbursing officer delivered to Gaffney, one of the contractors, a draft for $4,400, in payment of the amount unpaid on the contract, which he delivered on the same day to the defendants, Conde & Company, to secure them for liabilities, as indorsers and otherwise, previously incurred for the benefit of Witherby & Gaffney. The defendants, Conde & Company, before they had parted with the draft, were notified by the plaintiffs, York & Starkweather, of their claim and of the terms of the assignment to them, and they demanded that defendants pay them out of said draft the sum of $2,500, the amount remaining unpaid to them by Witherby & Gaffney. This the defendants refused to do, and an action was brought to recover the sum. The defendants appeared and pleaded the priority of a verbal assignment, antecedent even to that of the plaintiffs; but this issue resulted in a verdict against them. They then asserted the nullity of plaintiffs' assignment under section 3477 Revised Statutes of the United States. The court, in an opinion by Chief Justice Andrews, discusses the subject at length and the authorities bearing upon it. His opinion is in part as follows:

"There are two theories of construction of the statute. One is that which gives the widest meaning to the words and which makes a transfer or assignment of a claim or interest void, not only as to the government and its officers, but as to the parties to the transfer or assignment. Upon this theory the money, when paid over to the original claimant, cannot be reached in his hands unless, after the allowance of the claim and the issuing of a warrant for its payment, the provisions of the section were complied with. This theory wholly forbids the acquisition before this has been done of any right in the fund through any

transfer or assignment, however formal the instrument or however just and innocent the transaction.   The other theory is that the objects of the statute are accomplished by a construction which makes an assignment or transfer made before the allowance of a claim void as between the claimant and the government, but leaves the transferee, after the fund has come to the hands of the claimant, to assert such legal rights against the fund and avail himself of such legal remedies to enforce them as exist in other cases of transfer.   The Supreme Court has consistently maintained that a transfer or assignment made before the allowance of a claim was void at the election of the government, and that as against the assignee or transferee the government may wholly disregard it, and that payment made to the original claimant by the government is a good acquittance of the liability, although it had notice of the transfer at the time. But the court has also decided that the government may recognize such a transfer and that payment to the transferee will protect it against any subsequent claim of the original party.

"In our opinion, a just construction of the statute does not invalidate the transfer of Witherby & Gaffney to the plaintiffs, nor will the objects of the statute be defeated by the construction that such a transfer, made in the legitimate and usual course of business, in good faith, to secure an honest debt, while it may be disregarded by the government, is good as between the parties so far as to enable the transferee, after the government has paid over the money to the claimant, to enforce as against him or those who take with notice, the interest or lien given by the assignment.   The fact that the government may refuse to recognize any transfer or assignment, in connection with the general principle of law which avoids all agreements contrary to public policy, will be a sufficient discouragement to illegitimate transactions, or, at all events, it is all the law can justly interpose, having due regard to the exigencies of business and the protection of innocent parties.   The Supreme Court of Massachusetts, in *Jernegan* v. *Osborn* (155 Mass. 207, 29 N. E.

520), reached substantially the same conclusion as that to which we have arrived."

The Case of *York* v. *Conde* was carried to the Supreme Court of the United States, and the appeal was subsequently dismissed as not presenting a Federal question, (168 U. S. 642, 42 L. Ed. 611, 18 Sup. Ct. 234). The Chief Justice, referring to the opinion of the State court, said: "Many decisions of this court in respect of section 3477 were then considered, and the conclusion reached that the section had been so construed as to permit transfers made in the legitimate course of business, in good faith, to secure an honest debt, while they might be disregarded by the government, to be sustained as between the parties so far as to enable the transferees, after the government had paid over the money to its contractors, to enforce them against the latter, or those taking with notice. The court held, in effect, that such was the transaction in the case at bar, and that the transfer to York & Starkweather was simply to secure them for material actually used by the contractors in performing their contract with the government, and amounted to nothing more than the giving of security, and not to the assignment of a claim to be enforced against the government. The United States had, in due course, paid over the money to the contractors, and between them there was no dispute; nor had the United States any concern in the question as to which of the rival claimants was entitled to the fund, the proper distribution of which depended on the equities between them."

We are of opinion that the assignment under consideration was valid between the parties and is not avoided by section 3477 of the Revised Statutes of the United States.

That assignment being valid, we are of opinion that the rights of the bank under it, which accrued not later than October, 1900, are superior to the liens for labor and supplies, none of which were obtained before December, 1902.

This branch of the case is, we think, covered by the decision of this court in *Millhiser, &c., Co.* v. *Gallego Mills Co.*, 101 Va.

579, 44 S. E. 760. The hypothecation in that case was of warehouse receipts, and it was held that the due endorsement and transfer to a *bona fide* holder for value of a warehouse receipt for goods to be delivered upon order of the depositor, or upon the surrender of the receipt, "operates to transfer to the holder the legal title to such goods and the possession thereof as effectually as if there were a physical delivery of the goods to a purchaser. This doctrine rests upon principles of equitable estoppel. It is immaterial that the goods are the property of the warehouseman, or that he stores only his own goods, or that they were commingled in bulk with other goods"; that it operated by way of estoppel to transfer the title to the wheat; and that after the milling company had issued and negotiated to a *bona fide* holder for value warehouse receipts for its products, the goods represented by such receipts are not personal property of the company, within the meaning of section 2485 of the Code, so as to be liable to a lien for supplies furnished the company. In the course of the opinion Judge Cardwell says: "While it is doubtless true, as claimed in the argument for appellants, that in the enactment of the labor and supply lien statute under consideration, the legislature had in view the two-fold purpose: First, to increase the industries of the State, develop its resources, and add to its wealth and prosperity by fostering and encouraging corporate enterprises, and affording producing companies a source of credit whereby they might obtain the labor and raw material necessary to the operation of their plants, without which labor and supplies such companies would be unable to commence their operations; and, second, to guard property rights of other individuals and corporations who should be willing to furnish their supplies on credit; will it be contended that a construction of the statute which would allow a supply man to file his claim in the clerk's office after the title to property has passed to a purchaser or a lender of money to a manufacturing company, as in the case at bar, and permit the claim thus filed to reach back and take

from the purchaser or the lender of money property that had already become his, would be in furtherance of or even consonant with the purposes of the statute? Such a construction of the statute would be disastrous to the laborer, the supply man, the manufacturer and others conducting industrial enterprises in this State alike, as doubtless many of the manufacturing plants and other industries employing labor and daily purchasing supplies would be forced to close their doors, since, it may be said as a matter of common knowledge, many of them have only a moderate capital and do business chiefly by borrowing money of banks and capitalists upon warehouse and other storage receipts representing the products of the manufacturing concern or other personal property, nor forming a part of the plant, as a basis of credit. Such receipts, as we have seen, are valid at common law as collateral for loans, and heretofore have served as a basis of credit, enabling manufacturing concerns to increase their business far beyond what they could do if left to borrow upon its credit only. It is of the highest importance, as has often been repeated by law writers and the highest courts of both England and America, to protect commercial credit, and this can only be done where commercial paper is held inviolable in the hands of *bona fide* holders. It has also often been repeated that courts should be especially careful not to throw doubt upon mercantile usages and the customs of business men."

A contrary rule would drive out of business every enterprise which was not backed by sufficient capital to meet all the demands of its current expenses as they accrued. It would make it impossible for men having a small capital successfully to engage in and conduct their business. It is essential to the existence of every mercantile, manufacturing or business enterprise to borrow money from time to time, and to do so they must be able to hypothecate as security such resources as may be under their control; and to enable them to negotiate loans to the best advantage, or to do so at all, the law must protect

as far as possible commercial paper in the hands of *bona fide*
holders, and be "careful not to throw doubt upon mercantile
usages and the customs of business men."

The money received by the Trigg Company from the bank
was necessary to the conduct of its business, and when received
was paid out for material, supplies and labor with which to
prosecute its business; and we are of opinion that from every
point of view the claim of the bank is meritorious and ought
to prevail; that its exception to the report of the commissioner
should have been sustained; and that, in this respect, the de-
cree appealed from is erroneous and should be reversed.


CARDWELL, J.:

A history of the insolvency proceedings against the William
R. Trigg Company, a corporation engaged in the building and
equipment of ships, boats and vessels at Richmond, Va., con-
ducted in the above styled cause and leading up to the adjudi-
cations of the Chancery Court of the city of Richmond, from
which this appeal is taken, has been fully stated in the cases
of *Trigg Co.* v. *Bucyrus Co., et als.,* 104 Va. 79, 51 S. E. 174,
and *Bank* v. *Trigg Co.,* 106 Va. 327, 56 S. E. 158, and need
not be here repeated. In this connection, however, it is to be
noted that in those cases, as held by the decree now under
review, the William R. Trigg Company was held to be a man-
ufacturing corporation, within the meaning of the Virginia
labor and supply lien statute in force when the company was
chartered and when it became insolvent; and that said statute
was not void as being contrary to the Constitution of the State
of Virginia or to the Constitution of the United States. These
questions are, therefore, *res adjudicata* in this cause.

Following the adjudication of this court in *Bank* v. *Trigg
Co., supra,* the court below ruled upon certain exceptions taken
by parties in interest to the report (No. 4) of Master Com-
missioner E. C. Massie of the property of the Trigg Company,
its value, etc., an account of the debts due by the company, the

liens upon its property, and the various priorities of such liens, etc.; and from the decree effectuating those rulings this appeal is taken.

Of the twenty-seven assignments of error in the petition for the appeal the last relates to a controversy between the First National Bank of Richmond, Va., and the supply lien creditors of the Trigg Company, which controversy has been determined by this court in an opinion by Keith, P., just handed down, and will, therefore, not be further considered in this opinion.

Taking up in logical sequence the remaining questions presented we come first to the controversy between the United States Government and the appellants with respect to the rights of these contestants in the property and funds under the control of the court, growing out of certain contracts under which the Trigg Company undertook to construct, and was engaged in constructing, when its property and affairs were placed in the hands and control of the receiver of the court in this cause, three vessels for the United States Government, viz., a dredge for the War Department, called the "Benyuard," a revenue cutter for the Treasury Department, called the "Mohawk," and a cruiser for the Navy Department, called the "Galveston," each being constructed under a written contract setting forth the terms and conditions upon which the work was to be done, and indicating the rights of the parties, respectively.

The price to be paid for the dredge "Benyuard" was $275,-375, in ten equal payments, to which was added $2,180 for an electric plant to be installed thereon, the contract stipulating for title to the dredge in the government as its construction progressed, and as payments therefor should from time to time be made; and with respect to the other two vessels ("Mohawk" and "Galveston") the contract price named for the "Mohawk" was $217,000, and for the "Galveston" $1,027,000, to be paid in twenty equal installments as the work progressed, etc.; the contract in each case stipulating that the government should have *a lien* on the vessel and upon the *materials* "on

hand for use in her construction," as payments should be made, the *lien* to commence with the first payment.

At the time the receiver was appointed, the government had paid a large amount on account of each of these vessels— for the "Benyuard," $142,550.00, for the "Mohawk," $149,-437, and for the "Galveston," $698,514.45—and there was on hand a considerable amount of material that had been accumulated and set apart to be used in the construction of the vessels. The vessels, as well as this material, were taken possession of by the receiver, as parts of the assets of the Trigg Company, although claimed by the agents of the United States Government as the property of the government, and accordingly a stipulation in regard to each of the vessels and the material assembled for their construction was filed in this cause by the Attorney of the United States for the Eastern District of Virginia, in conformity with the provisions of the statute contained in sections 3753 and 3754 of the Revised Statutes of the United States; whereupon the said vessels were, under decrees of the court, delivered to the agents of the United States Government.

The question decided by the lower court and presented on this appeal is, whether title to these several vessels was in the government or the Trigg Company, and, if in the latter, have its creditors who have sued out and caused to be recorded, in accordance with the labor and supply lien statute of the State, claims for supplies furnished the Trigg Company of date subsequent to the contracts between the United States Government and the Trigg Company above referred to, priority of right to satisfaction over the rights of the government in the said vessels?

The labor and supply lien statute, section 2485 of the Code of 1887, as amended by the act found in Acts 1891-2, p. 362, so far as concerns the controversy before us, declares: "All persons furnishing supplies to a mining or manufacturing company, necessary to the operation of the same, shall have a prior

lien upon the personal property of such company other than that forming part of its plant, to the extent of the money due them for such supplies, and also a lien upon all the estate real and personal of such company, which said last lien, however, upon all such real and personal estate, shall be subject and inferior to any lien by deed of trust, mortgage, hypothecation, sale, or conveyance, made or executed and duly admitted to record prior to date at which said supplies are furnished."

At the time that the validity of the supply liens of the creditors of the Trigg Company was determined by a former decree in this cause, which was afterwards sustained by this court in *Bank* v. *Trigg Co., supra,* the property of the Trigg Company to which the liens attached had not been ascertained, but was reserved for future determination, and accordingly Master Commissioner E. C. Massie, to whom the cause had been referred, filed a report, wherein he reported that the several vessels in dispute, except the "Benyuard," were liable to the claims of the several creditors of the Trigg Company which had been duly filed under the statute; that with respect to the "Benyuard," if any title passed to the United States Government therein, such title was subject to the said liens, and said liens could be enforced because the United States had not acquired such possession of the "Benyuard" as protects it from the process of the court; and that with respect to the "Mohawk" and the "Galveston" the supply liens were superior to the lien reserved in the contract in favor of the United States.

Upon the hearing of the cause upon Commissioner Massie's report, and the exceptions thereto, the court sustained the exceptions, so far as they related to the title to the vessels, holding that title thereto was in the government and not in the Trigg Company, and that the supply creditors were entitled to no lien thereon.

The first question presented is whether, under the rules of law applicable to the contract between the Trigg Company and the United States Government, the dredge "Benyuard," at the

time the supply lien creditors filed their respective claims under the statute, *supra,* belonged to the United States Government or to the Trigg Company?

It is apparent upon the face of the record that when this contract was entered into between the Trigg Company and the United States Government, providing for the building and equipment of the dredge "Benyuard," the Trigg Company was dependent upon the compensation it was to receive for the dredge as it progressed towards completion, and also upon its credit, in purchasing the needed materials and paying the labor to be employed in its construction and completion.

Its general provisions to be borne in mind are:  All materials furnished and the work done by the Trigg Company were to be subject to rigid inspection by an inspector appointed on the part of the government, his decision to be final as to quality and quantity.  If the Trigg Company should fail to begin or prosecute the work in accordance with the specifications (made part of the contract) the contract might be annulled by the government.  In that case all payments were to cease, and all money or reserved percentage to be retained until the final completion and acceptance of the dredge, which was to be completed at the cost of the Trigg Company, the government to have the right to recover anything paid for such completion in excess of the original contract price of the Trigg Company, including all extra costs of inspection; and might proceed under section 3709 of the Revised Statutes of the United States to provide for the completion of the dredge by open purchase or contract, unless the time (sixteen months) for such completion should be extended, the Trigg Company, by express provision, to be responsible for and pay all liabilities incurred in the prosecution of the work for labor and material until final acceptance of and payment for the dredge.

It was further provided (section 9) that no prior inspection, payment or act was to be construed as a waiver of the right of the government to reject any defective work or material.

By the 11th section, payments were to be made when the dredge contracted for had been delivered and accepted as set forth in paragraph 210, which is as follows: "Provided the requirements of these specifications are complied with, ten equal payments will be made, based on the reports of the inspector, the first when the hull and propelling machinery are 10 *per cent.* completed, the second when 20 *per cent.* completed, and so on, the last payment being made when the work is turned over to the United States after successful trial as required by paragraph 209. From each of these payments, except the last, 20 *per cent.* will be reserved until final payment. For computing the percentage of completion of this work it will be assumed, in the case of the twin-screw steel hull dredge described in detail above, that the cost of the hull is 72 *per cent.* of the whole, and the cost of the propelling machinery 28 *per cent.;* and a similar basis for computing payments will be adopted should an alternative proposal be accepted."

Reverting to the material specifications to be read in connected with the contract, section 199 declared that: "The purpose and spirit of these specifications are that the contractor (The Trigg Co.) is to provide and deliver a standard dredge hull and first class machinery, complete in every respect"; and section 206 provided for the full responsibility on the part of the contractor for the safety of its employees, plant and materials, and "for any damage or injury done by or to them from any source or cause." Section 209 provided for sea trials of the dredge at the expense of the contractor, and that any defects that might appear were to be remedied by the contractor, and that trials might be repeated until the dredge should be found satisfactory in all respects.

The provisions of section 211, relating to ownership, are as follows: "All parts paid for under the system of partial payments above specified shall become thereby the sole property of the United States, but this provision shall not be interpreted as relieving the contractor from the sole responsibility for

the proper care and protection of said parts prior to the delivery of the dredge to the United States, or from any other of the provisions of these specifications."

Section 212 provided for insurance against fire and marine risks, at the contractor's cost and in behalf of the United States, to at least the amount of each partial payment. Here we have, in this last-quoted section the usual stipulation in contracts of insurance that loss, if any, was to be payable to the parties concerned, as their interest might appear; and in this case the government was not concerned in the contemplated insurance beyond security for the partial payments it had made to the contractor on a contemplated purchase of the dredge if it was finally accepted on test that it had been completed and equipped in accordance with the terms of the contract—nothing more or less than a contemplated acquisition of title to a dredge for the use of the War Department of the government in the event that the government at a future day elected to take over the dredge as a purchaser, the ownership thereof remaining in the builder (Trigg Co.) until this final decision was made. Meantime, between the date of the contract and the contemplated final decision of the government as to whether or not it would become the owner of the dredge, it was only to be constructed from start to finish with materials to be acquired and paid for by the builder. The government sought to provide security for the partial payments of purchase money, as made from time to time, by its contract with the builder, while those furnishing materials needed in the construction and equipment of the dredge had the security provided for them by the statute in such case made and provided, viz., that they should have a *prior* lien upon the personal property of the builder to the extent of the money due them for such supplies, etc.

It having been held by this court, as we have observed, that the Trigg Company was a manufacturing company, and that its contracts were, therefore, subject to the provisions of our

statute (section 2485 of the Code, *supra*), fixing the rights of those furnishing labor or materials to the company, what reason is there for the nullification of that statute as applied to this case? It has been well settled that every contract must be considered as made with reference to the existing laws by which its performance may be governed.

In *United States* v. *Quincey,* 4 Wall. 535, 18 L. Ed. 403, the opinion says: "It is also settled that the laws which subsist at the time and place of the making of a contract, and where it is to be performed, enter into and form a part of it, as if they were expressly referred to or incorporated into its terms. This principle embraces alike those which affect its validity, construction, discharge and enforcement."

In the later case of *Walker* v. *Whitehead,* 16 Wall. 214, 21 L. Ed. 357, the above statement was repeated, and the opinion said: "These propositions may be considered consequent axioms in our jurisprudence."

Again, in *United States* v. *Bostwick,* 94 U. S. 66, 24 L. Ed. 65, the opinion by Waite, C. J., said: "The United States, when they contract with their citizens, are controlled by the same laws that govern the citizen in that behalf. All obligations which would be implied against citizens under the same circumstances will be implied against them."

The foregoing principles were fully recognized by the government as well as the Trigg Co. when the contract before us was entered into, and for the very purpose of avoiding the rights secured to labor and supply lien creditors by our labor and supply lien statute a stipulation was inserted in the contract, that the "William R. Trigg Co. should be responsible for and pay all liabilities incurred in the prosecution of the work for labor and materials." In fact, the learned counsel for the government seems to concede the soundness of the above doctrine, and further that the doctrine laid down in *Briggs* v. *A Light Boat,* 7 Allen (Mass.) 297, applies to this case, .viz.: "If it

(property purchased by the United States Government) is subject to liens or incumbrances, it passes *cum onere."*

This is not a case in our opinion, as is earnestly pressed upon us in the argument on behalf of the government, involving the doctrine relating to "sovereignty." Nor do the principles pronounced in *Milhiser* v. *Gallego Mills Co.,* 101 Va. 579, 44 S. E. 760, apply to the case, as we shall see later in this opinion.

The right to reject the dredge, or to annul the contract under which it was to be built, is wholly inconsistent with the idea that title passed. Let us suppose that the final tests stipulated for had been applied to the dredge and proved unsatisfactory, and the government, as it had clearly the right to do, refused to take over the ownership thereof, electing to look to the provisions of the contract providing indemnity against loss on account of the partial payments that it had made to the Trigg Company, would not the dredge then have been liable to liens for supplies furnished the latter, as provided by our statute? Clearly so, and we are unable to find anything in the contract or in the authorities applicable to its construction which postponed the attaching of liens in favor of supply creditors till the government finally determined not to become the owner of the dredge.

As in the case of *Clarkson* v. *Stevens,* 106 U. S. 56, 27 L. Ed. 139, 1 Sup. Ct. 200, the leading intent of the contract is, that the vessel in all respects was to be at the risk of the builder until, upon completion, the United States should accept it, upon final examination and certificate, as conforming in every particular with the requirements of the contract. It would seem to us unreasonable to construe this contract as a purchase and taking over the ownership of the dredge "Benyuard" by the government, for at that date neither the dredge nor any part thereof was in existence, and the provisions of the contract only intended to provide that as the same progressed in construction and was paid for it should be regarded as a colla-

teral for the security of advancements made by the government
to the builder during construction; so that, whether the govern-
ment be considered as taking over the ownership of the dredge
under the contract, as payments therefor were made, or merely
intended to provide for a lien thereon for money advanced in
aid of the construction and equipment of the dredge, the title
in the first instance was transferred "subject to liens and in-
cumbrances, and passed *cum onere";* and in the second, what-
ever lien or liens the government acquired under the contract
were *inferior* to the rights secured to the supply lien creditors
of the Trigg Company by our statute.

The dredge formed no part of the plant of the Trigg Com-
pany, and the statute expressly makes the supply lien "prior"
to any other lien, etc., on that class of property, created by
hypothecation or otherwise.   It is very true that this "prior
lien" given by the statute to persons furnishing supplies to a
manufacturing company is expressly confined to "property of
such company," and cannot, therefore, be extended to property
which was at the time the supplies were furnished "the sole
property of the United States"; but in our view as to the rights
of the respective parties to this controversy the dredge in ques-
tion was not the property of the United States, but the property
of the Trigg Company and subject to the lien of supply credi-
tors and to the claims of other creditors of the Trigg Company.

If this be not the correct view, it can be readily seen how
easily the salutary provisions of our labor and supply lien stat-
ute might be frittered away, especially by conveyances to or
contracts with the government, and that, too, in face of the
well settled doctrine that the extent of the rights of the gov-
ernment, like those of a private citizen, are determined by the
rights of its grantor.   It cannot be questioned that the supply-
lien statute bound the Trigg Company as though it formed
a part of the charter of the company, and disabled it from
giving a lien upon, or otherwise disposing of, its property
liable to the liens provided by the statute which interfered with

the priority of such liens.   Therefore the government in this case could only acquire what the Trigg Company had the authority to part with, and it could not give title to or lien upon any property it owned liable to liens in favor of its supply creditors.   The Trigg Company being bound by the supply lien law, the government was bound thereby.

The contract in this case, as in *Briggs* v. *Light Boat, supra,* only provided for a purchase of the boat or vessel upon its completion according to specifications, and indemnity against loss of the partial payments made thereon to be effective if the party for whom it was to be built, upon the tests stipulated for being applied, should determine not to purchase the vessel, and the ownership thereof in the meantime necessarily remained in the builder.   Under such a contract the authorities agree with decided unanimity that the ownership of the boat remains in the builder till taken over by the party for whom built when completed, as provided in the contract.

A contract between the United States Government and a citizen or a corporation for the building of a boat or vessel for the use of the government, or of any department thereof, differs in no essential feature from a contract between two citizens, or between an individual citizen and a corporation. The rules of construction are the same in either case, and the contract is entered into subject to the principles referred to above.   To sustain these principles in this case it is not at all necessary that any lien be declared as existing on the property of the United States, but simply upon the property of the Trigg Company which the United States Government took when it acquired the "Benyuard" under the decrees of the court in this cause, with the stipulation to return or pay for the same should it transpire that the government had thus taken property to which it was not entitled.

The case of *Stanley* v. *Schwalby,* 147 U. S. 508-515, 37 L. Ed. 259, 13 Sup. Ct. 418, does not apply.   The action in that case was to try title to a lot of land in the possession of the

government, and all that was decided by the Supreme Court of the United States was, that the State court erred in its ruling that the United States Government could not by plea take advantage of the Texas statute of limitation.

In *Southern Pac. Co.* v. *United States,* 28 Court of Claims 77, the opinion says: "When the government enters into a contract, it lays down its constitutional authority, and has only the same rights and is subject to the same obligations as an individual."

The case of *Andrews* v. *Durant,* 11 N. Y. 35, 62 Am. Dec. 55, relied on for the government in this case, does lay down that it is competent for the parties to agree when and upon what conditions the property which is the subject of the contract shall vest in the prospective owner, and that in such a case the question is simply one of construction. The contest in that case was, however, between the creditors of a shipbuilder and his patron for whom the vessel was being built, and in construing the contract the opinion by Judge Denio held that partial payments and superintendence by the patron were not sufficient to make the title vest in him, but that the title remained in the shipbuilder, and that the unfinished vessel was subject to the claims of the creditors. See also *Williams* v. *Jackson,* 16 Gray (Mass.) 514.

The opinion expressed by Mr. Myers, vice-president and later the receiver of the Trigg Company in his oral testimony in this cause, over the objection of appellants, even if admissible, can have no weight in construing the contract we have under consideration, since the mere opinion of Mr. Myers as to whether a vessel being built by his company, or any part thereof, under the contract became the property of the party for whom it was being built, and at what time or at what stages of its construction, or what parts thereof, forms no part of the contract.

The contention in the court below was that the dredge "Benyuard" and the tugs "Mohawk" and "Galveston" passed to the government because the contract provided for an inspector and

provided for the payment of installments as the work progressed; but we are by the authorities brought to the conclusion that the court, in upholding that contention, violated the rule firmly established in America.

Mechem on Sales, Vol. I, sec. 755, after stating the general rule under contracts for the construction of a vessel for a given price to be that no property passes in the vessel until it be completed and delivered, says, that this general rule is not varied by any or all of the following facts: "That the price is to be paid in installments as the work progresses; that the vessel is to be built under the superintendence of an inspector employed by the purchaser; that this inspector has the power to approve or reject the materials to be used in constructing the vessel; that the vessel is insured for the benefit of the purchaser; that the contract stipulates that the materials, as and when approved, should become the property of and belong to the purchaser. In other words, the passage of title to a chattel to be constructed is a matter of intention of parties to be arrived at from the terms of the contract between them; the rule being that no property passes until completion, and that none of the above mentioned circumstances indicated an intention in the parties to vary this general rule by the contract." See also 2 Parsons on Contracts, 259, 260, where the authorities are cited and reviewed.

In *Briggs* v. *Light Boat, supra,* Briggs furnished lumber for certain light boats being built by one Andrews, under contract, for the United States, the contract being entire, providing for payment in full by the government upon completion and acceptance of the boats, and also providing that the government might furnish an inspector, but was not required to do so, and that the government should have the right to declare the contract forfeited in case the work should not progress or be done satisfactorily. The boats were completed and accepted by the government, and Briggs then claimed a lien for his supplies under the Massachusetts statutes, and the supreme judicial

court of that State, in an opinion by Gray, J., reviewing all the authorities, English and American, adhered to the decision rendered upon a former appeal of the case, that a lien attached to a vessel built for the United States before the government took posssssion of the same. *Briggs* v. *Light Boats, supra.* In that case it was also held, it is true, that a lien of the character claimed by Briggs, held good upon a vessel built for the United States attaching before the government took possession of the same, could not be enforced in a State court upon proceedings commenced after the government has taken possession (and upon the fundamental principle, doubtless, that a sovereign cannot be sued without his consent), but that the rule was different in cases in which the United States is plaintiff. We are not, however, concerned as to the ruling with respect to jurisdiction in that case, as no such question arises in this case, where there is no attempt to invade the possession of the United States under a process of our State court, but the case is one in which the government has come and submitted its rights for the determination of the State court. *The Davis,* 10 Wall. 15, 19 L. Ed. 875.

It is very true also that the authorities agree that the general rule in cases like this is to be applied according as the intention of the parties may be ascertained from the contract; but we are unable to see how it can be said that it was the intention of the parties to the contract construed in this case that the dredge was to become the property of the government as its building progressed and partial payments therefor were made, free from liability to the claims of the supply creditors of the builder, when by the provisions of the contract, fairly construed, the government deferred its determination as to whether it would become the owner of the dredge until it was completed and the agreed final tests had been applied and proved satisfactory.

"When a contract is made for the purchase of an article hereafter to be delivered and paid for, so long as any act re-

mains to be done by the vendor in order to put it in a state of readiness for delivery, the property does not pass to the buyer, but still remains at the risk of the seller." *Trigg Co.* v. *Bucyrus Co., supra.*

Though the government took possession of the dredge, this case, according to the express provision of the Federal statute under which the possession was obtained, is to be decided as if the possession of the Trigg Company had never been interrupted.

The case of *United States* v. *Snyder,* 149 U. S. 110, 37 L. Ed. 705, 13 Sup. Ct. 846, in which there was involved a lien for taxation fixed by Federal statute, does not apply here, since there is no Federal statute involved.    The right of the government being contractual merely, no element of sovereignty enters into the case.    See authorities cited above, and *Gilbert* v. *United States,* 1 Court of Claims 28, where it is said: "The rule regarding the effect to be given to a written contract when the United States are a party is the same as between man and man."

The contract in *Clarkson* v. *Stevens,* 106 U. S. 516, 27 L. Ed. 139, 1 Sup. Ct. 200, provided for an inspecting officer, but expressly declared that he should not pass upon the quality or fitness of the materials or workmanship, but merely as to the cost thereof.    It provided that the inspector should receive and receipt for all materials on account of the Navy Department, which materials should then be distinctly marked with the letters, "U. S.," and should become the property of and belong to the United States.    It further provided that Stevens should give a mortgage for the faithful performance of the contract, and final payment for the boat was only to be made after final inspection and acceptance.    Upon that state of facts it was held that the United States acquired no title to the boat by its partial payment therefor; that the reservation of final payment and the requirement of a mortgage for the faithful performance of the contract were conclusive circumstances to show

that no title was intended to be acquired by the United States upon its partial payments.

The decision in that case applies with all of its force to the contract we are now considering, for while the contractor (Trigg Co.) was not required to give a mortgage, it was required to give bond with good security in the penalty of $60,-000 for the faithful performance "of all and singular the covenants, conditions and agreements" of the contract, which contained a special provision for the prompt payment in full to all persons supplying labor and materials, and the other essential features are very similar to the provisions of the contract in *Clarkson* v. *Stevens, supra.* See also 2 Parsons on Contracts, 259-60, and the authorities there cited.

If there be terms in the contract going to show that the parties intended that certain parts of the vessel should pass to the vendee as the work progressed and was paid for, it would be easy, as the authorities hold, for the parties so to provide in the contract in express terms; but where the contract, as in this case, contains terms and stipulations wholly inconsistent, with any such intention, the general rule of law, that no property in the chattel passes to the vendee till the chattel is completed and delivered, should and must prevail. Authorities above cited, especially *Briggs* v. *A Light Boat; Williams* v. *Jackson; Elliott* v. *Edwards,* 35 N. J. L. 265; *Harvey* v. *The Schooner "Rosabelle,"* 20 Wis. 261.

"A person who makes a contract in writing for the building of a ship, to be finished and ready for sea on a day and at a place named in the contract, for a fixed price, part of which he agrees to pay while the work is in progress, in regular weekly payments, without regard to the amount of work accomplished, and the remainder when the ship is ready for sea, acquires no property in the ship before her completion, although an agent employed and paid by him to superintend the construction is, by oral permission of the builders, present every

day while the ship is building, making suggestions and giving directions about the work." *Williams* v. *Jackson, supra.*

"That no title passes, ordinarily, during the progress of the work is now clear. This rule prevails in this country, contrary to the later but in conformity with the early English rule, notwithstanding that, by the terms of the contract, the purchaser was to pay and has paid a portion of the price in installments as the work progressed. It also prevails, notwithstanding the fact that the purchaser has furnished a part of the materials, and, by the weight of authority, it prevails though the purchaser not only paid the price in installments as the work progressed, but also, in person or by his agent, superintended the work of construction." 1 Mechem on Sales, sec. 755.

The title to the dredge remaining in the Trigg Company, it is liable to the demands of its creditors, and first to the supply liens of appellants, which attached before the United States acquired any possession of the dredge "Benyuard," it follows that said liens and debts may be enforced against the United States, pursuant not only to the stipulations contained in the agreement filed in this cause and under which the dredge was delivered into the possession of the government, but pursuant to the settled law applicable to the facts and circumstances of the case.

At the time that the receiver for the Trigg Company was appointed in this cause there were seven boats in process of completion at the yards of the Trigg Company, and certain materials had been set apart for use in the construction of each one of them. Of these boats the "Benyuard," the "Mohawk," and the "Galveston," were being built for the United States government, and the remaining four were being built for corporations. No two of the contracts under which these boats were being built were alike. Coming, then, next to the "Mohawk," we find that this boat was officially known as Revenue Cutter No. 8, and was built under contract with the Secretary of the Treasury of the United States. The contract

was dated April 20, 1900, and provided that the vessel should be delivered "afloat and complete in all respects and ready for service"; that it should be "subject to inspection and approval of superintendents appointed by the Secretary of the Treasury, with full power to reject or approve any materials or articles used in said construction and at any stage of the work before final approval"; that the government might complete the vessel in case the Trigg Company failed to do so, at the cost of the latter; that insurance should be taken out for the benefit of the United States; that the government should pay for said vessel "when the same shall have been fully completed and finished and delivered as specified, and shall have been inspected by the properly authorized inspecting officers for the government, pronounced satisfactory in all respects, and the trial trip successfully made, the sum of $217,000"; and that the trial trip shall be made at the expense of the contractors.   It was then:

"Provided, that the Secretary of the Treasury may, in his discretion, make payments under this contract during the progress of the work not to exceed seventy-five (75 *per cent.*) of the value of the labor and materials actually furnished and delivered (and not paid for) at the date of any such payment;

"Provided, that a lien shall be, and hereby is, reserved to the United States upon the hull, machinery, fittings, and equipment of said vessel, and the materials on hand for use in her construction, respectively and collectively, for all moneys advanced on account thereof, and that such liens shall commence with the first payment, and shall thereupon attach to the work done and the materials furnished, and shall in like manner attach, from time to time, as the work progresses, and as further payments are made, and shall continue until the completion and acceptance of said vessel."

At the same time and as a part of this contract a bond was given by the William R. Trigg Company with the Virginia Trust Company as surety, in the penalty of $45,000.00, con-

ditioned for the proper construction of the vessel according to the contract and specifications, and that the Trigg Company "shall promptly make payments to all persons supplying said contractors labor and materials in the prosecution of the work."

There are but two distinctions between this case and that of the "Benyuard," viz.: first, that here the contract was made with the United States Secretary of the Treasury; and, second, the government here only undertook to acquire a lien for payments made as the completion of the vessel progressed. The contract was entered into pursuant to a joint resolution of Congress, passed on May 5, 1894, providing as follows:

"That the Secretary of the Treasury be, and he hereby is, authorized to make partial payments, from time to time, upon existing contracts and all contracts hereafter made for the construction of vessels for the Treasury Department, but not in excess of 75 *per cent.* of the amount of the value of the work already done; that the contracts hereafter made shall provide for a lien upon such vessels for all advances so made: Provided, that nothing in this joint resolution shall be construed to hereafter authorize any partial payments, except on contracts stipulating for the same, and then only in accordance with such contract stipulations."

The difference between an Act of Congress and a joint resolution is, that the former governs all persons under the jurisdiction of the enacting power, while the latter is but a rule for the guidance of the agents and servants of the sovereign. 26 Am. & Eng. Enc. L., 560, and notes.

We fully agree with the view taken by counsel for the appellants, and the master commissioner who reported the liens with their priorities, etc., existing on the Trigg Company's property when the receiver took possession thereof, that said joint resolution imposed no lien in favor of the United States upon vessels being constructed for it, but simply prescribed a rule as to how contracts should be made by the Secretary of

the Treasury; and clearly this contract was made in accordance with the rule.

Here we have a conflict between a contractual lien in favor of the United States Government, and liens given the creditors of the Trigg Company under the laws of Virginia, the liens of these creditors having attached to the property in question before the government acquired possession of it, whatever may be the rights asserted by the government as to a lien thereon; and very clearly the contract for the building of the "Mohawk" was made with reference to the statutory lien in favor of laborers and supply creditors of the Trigg Company, for the government not only undertook to protect itself by reservations of twenty-five *per cent.* on all payments, but required the Trigg Company to furnish a bond with good security in the penalty of $45,000, conditioned for the proper construction of the vessel according to the contract, etc., and that the Trigg Company "shall promptly make payments to all persons supplying said contractors labor and materials in the prosecution of the work."

In any view to be taken of this contract and of the joint resolution of Congress, pursuant to which the contract was entered into, the lien stipulated for is contractual only and not a statutory lien. What would have been its effect had it been a statutory lien we need not determine.

If, as the authorities we have cited in this opinion hold, the United States when contracting with a citizen contracts with reference to the laws in force within the jurisdiction where the contract is entered into, the case of *United States* v. *Snyder,* 149 U. S. 210, 37 L. Ed. 705, 13 Sup. Ct. 846, relied on so much by the learned attorney for the government, has no application whatever. To sustain the statutory supply liens of appellants upon the "Mohawk" does not "divest, postpone or affect" a title or lien in favor of the United States subsisting by virtue of a valid contract with the government. On the contrary, if the lien of the government, claimed as being superior to the liens of appellants, on the "Mohawk" be so declared, the

labor and supply lien statute of the State would become practically useless in all cases in which the United States Government contracts for a lien upon property of a mining or manufacturing company doing business in this State, though the property upon which the contractual lien in favor of the government rests forms no part of the plant of such mining or manufacturing company.

That the "Mohawk" in process of building formed no part of the plant of the Trigg Company is not controverted, and instead of the statute (sec. 2485 of the Code, *supra,*) expressly subordinating a lien for supplies to *any* previous lien, deed of trust, mortgage, hypothecation, etc., as is contended for the government, it declares it to be "a lien upon all the estate, real and personal," of a mining or manufacturing company, other than that forming a part of its plant, but makes the lien inferior only as to any "lien or deed of trust or mortgage, hypothecation, sale or conveyance, made or executed and duly admitted to record prior to the date at which such supplies are furnished."

Coming now to the contract for the construction of the cruiser "Galveston," made December 14, 1899, with the Secretary of the Navy, we find that the contract called for the completion of the cruiser in accordance with the plans and specifications made a part of the contract, and for its delivery at Norfolk within thirty months. The contract, like that for the building of the "Mohawk," provided for a lien for installment payments made by the government during construction, and stipulated that when the government declared the contract forfeited by reason of the Trigg Company's failure to go forward with the work and make satisfactory progress, the lien claimed by the government should be as "collateral security for the refund of the installments paid on the contract price for the cruiser."

We have been unable to find any authority of Congress for the payment of the installments on the "Galveston" or for the taking of a lien therefor, but we do not deem this of any importance. By certain officers of the United States the con-

tract was declared forfeited and threats made to take possession of the "Galveston" to be held as "collateral security" for the installment payments that had been made thereon, as provided in the contract; whereupon the receiver brought these facts to the attention of the court in this cause, and on June 18, 1903, a decree was entered as follows:

"That said William G. Groesbeck, Emil Theiss and W. H. Moody, Jr., and each of them, their agents, attorneys or employees, and all other persons, be, and they are hereby, enjoined and restrained from in any manner interfering with or taking possession of any property, and especially the cruiser 'Galveston' and dredge 'Benyuard,' under the control of or in the possession of Lilburn T. Myers, receiver of the court in this cause, under its orders heretofore entered, until the further orders of this court."

The "Galveston" was also released to the government upon stipulations being filed in this cause by the Hon. L. L. Lewis, United States District Attorney for the Eastern District of Virginia, as provided for in sections 3753 and 3754 of the Revised Statutes of the United States.

We do not deem it necessary to review the numerous authorities cited in the elaborate discussion by counsel as to the character of lien intended to be provided by the contract upon the "Galveston" in favor of the United States, as the provisions of the contract plainly indicate that after the declaration of forfeiture the only lien on the cruiser which the government could assert was that of a collateral security for a debt; and the fact that the 13th clause of the contract provided that in a future and uncertain event title to the cruiser might vest in the United States as "collateral security," in no wise qualified the right of property of the Trigg Company therein. The right of property in the cruiser was to remain in the Trigg Company until completion and delivery to the government, as we view the contract, and if the claim of supply lienors could not attach thereto, as provided in our labor and supply lien statute, it

would be a dead letter in all cases where the contract is for the building of a vessel for future delivery and passage of title to the government. As remarked above, the government, in entering into these contracts with the Trigg Company, recognized that under the Virginia labor and supply lien statute liens might attach to the vessel to be built for labor performed and materials furnished the builder, and sought by a provision in the contract to guard against such liens; and in this contract for the "Galveston" its 18th clause provided for a release of liens before partial payments could be required. This provision was more than "a prudent precaution to avoid controversies." It was a plain recognition that the Virginia lien statutes governed the property of Virginia corporations within the borders of the State. But if this were not true as a matter of fact, it is, as the authorities we have cited clearly show, true as a matter of law, and the government cannot complain in this case in the face of its failure to avail itself of the provision contained in the 18th clause of the contract, for if it had insisted upon its plain right thereunder, "that no liens or rights *in rem* of any kind against said vessel . . . have been or can be acquired," the government would have protected itself and at the same time have protected appellants.

The point made, that persons furnishing supplies to a shipbuilding company are put upon inquiry as to whether or not the company is engaged in constructing ships for the government and must govern themselves accordingly, does not refute the just claims of supply creditors who have furnished necessary materials or supplies for the operations of the company's business, a "prior" lien for which attached under the statute upon the property of the company not forming a part of its plant. If the duty of inquiry existed at all in this or the last case considered above, in the absence of information at the proper place —the office of records—the duty was no more binding either upon the contractor or those furnishing it with necessary supplies than upon the government to take heed of the basic law

of a corporation with which it was dealing. If the supply creditor knew that there was a contract with the government, the latter knew that to execute the contract supplies would be required, and must be held to know, at least in the contractual aspect of the lien, that it could gain no more than its grantor, the Trigg Company, could give.

In *United States* v. *Canal Bank,* Fed. Cas. No. 14, 715, 25 Fed. Cas. 278, the opinion says: "It has long been settled, by the solemn adjudication of the supreme court, that the United States do not possess any general right of priority or privilege over private creditors for the satisfaction of the debts due to them, founded upon any general prerogative belonging to the government in its sovereign capacity; but that all the priority or privilege which the government is at liberty to assert is or must be founded upon some statute passed by Congress in virtue of its constitutional authority. This was expressly so held in *United States* v. *Fisher,* 2 Cranch (6 U. S.) 358-396, 2 L. Ed. 304, and the doctrine has ever since been strictly adhered to. *U. S.* v. *Hoose,* 3 Cranch (7 U. S.) 73, 2 L. Ed. 370; *Prince* v. *Bartlett,* 8 Cranch (12 U. S.) 431, 3 L. Ed. 614; *Thelleson* v. *Smith,* 2 Wheat. (15 U. S.) 396, 4 L. Ed. 271; *U. S.* v. *Howland,* 4 Wheat. (17 U. S.) 108, 4 L. Ed. 526; *Conard* v. *Atlantic Ins. Co.,* 1 Pet. 441, 26 U. S. 387, 7 L. Ed. 189. It is not here as it is in England, where the sovereign is entitled, in virtue of his prerogative, to a priority over private creditors for satisfaction of debts due the crown. Com. Dig. 'Prerogative' D. 89; Id. 'Debt,' G. 8, G. 9."

See also *U. S.* v. *Bank of N. C.,* 6 Pet. 34, 8 L. Ed. 308; *U. S.* v. *Amer. Surety Co.* (C. C.), 111 Fed. 914; *U. S.* v. *Heaton* (C. C. A.), 128 Fed. 414; *U. S.* v. *Detroit L. Ins. Co.* (C. C. A.), 131 Fed. 668, 67 C. C. A. 1; *U. S.* v. *Amer. Surety Co.* (C. C. A.), 135 Fed. 79; *Briggs* v. *A Light Boat, supra.*

In view of the authorities cited, and for the reasons given in the discussion of the cases of the "Benyuard" and the "Mohawk," as well as this case of the "Galveston," we are of opin-

ion that the supply liens of appellants in each of these cases are superior to any claim of right in the government to the vessels or lien thereon reserved in its said contracts, and to the claims of the general creditors of the Trigg Co., as they may be established in this cause.

On June 30, 1902, a contract was entered into by the Trigg Company with the Pennsylvania Railroad Company for the construction of two tugs, spoken of as the "Bristol" and the "Chester." The first clause of the contract provided, that the contractor (Trigg Co.) should furnish all materials, and build, finish and deliver the tugs in six months at Jersey City, New Jersey; and there follow in the contract stipulations that the railroad company should pay for the work and materials furnished, after inspection, a total sum of $97,750, in ten partial payments as the building of the tugs progressed; that an inspector was to inspect the workmanship and all materials used, with full right to condemn or reject the same, etc.; that (8th clause) when all the work embraced in the contract was completed according to specifications, etc., releases should be furnished the railroad company by the contractor, under seal, from "all the mechanics and material men, all liens, claims and demands for materials furnished and provided and work and labor done," etc.; that the contractor would safeguard against accident, injuries, etc., to any person or property during construction, and indemnify and save harmless the railroad company therefrom, and from all fines, penalties, etc., incurred for and by reason of the violation of the ordinances of the city of Richmond, statutes of the State of Virginia or of the United States, while the tugs were in process of completion; that insurance against loss or damage by fire, etc., in favor of the railroad company, to an amount equal to that advanced by it in partial payments, should be taken out by the contractor; that satisfactory trial of the tugs, boilers, etc., should be made before acceptance by the railroad company, and the contractor "to arrange to have the said tugboats pass inspection by the

United States inspectors at the port of New York"; the railroad company to have the right to reject the tugs upon trial or final inspection, etc.; but no clause was inserted in the contract, either attempting to reserve a lien in favor of the railroad company for its partial payments, or attempting to provide that the title to the tugs should pass to the extent of any payments made.

It is shown in proof that the railroad company paid $60,000 prior to the appointment of the receiver in this cause, on account of the construction of these tugs, but that no releases of liens were ever asked for or furnished. At the time of the appointment of the receiver the "Bristol" was about 70 *per cent.* complete, and the "Chester" about 60 *per cent.,* and the tugs were sold in their incomplete state, bought by the railroad company at the price of $38,100, the sale confirmed by decree of the court, and this money is the substance in dispute in this branch of the case.

For the reasons stated, and in view of the authorities cited above, we are of opinion that the title to these unfinished tugs did not, in virtue of the contract for their construction, pass to the railroad company, but remained in the contractor, the Trigg Company, subject to the supply liens matured and reported in this cause, and to the rights of other creditors of the Trigg Company; and that the purchase money received for said tugs is, therefore, liable first to the said liens.

The contract, dated July 17, 1902, between the New York, Philadelphia and Norfolk Railroad Company and the Trigg Company for the construction of a sea-going tug, known as "Hull 23, Cape Charles," contained practically the same stipulations as to materials to be furnished, etc., for the construction of the boat; for inspection and trials, acceptance or rejection by the railroad company; for partial payments of the contract price, $68,250, as the work progressed; for protection to the railroad company against accident, etc., during construction; for insurance against loss by fire, etc.; and for

exoneration against mechanics' or material men's liens, that were contained in the contract for the construction of the "Bristol" and "Chester" we have just considered. In other words, the contract for the construction of the boat "Cape Charles" provided that "the intention of these specifications is to cover the construction, complete and ready for service, of a tugboat of dimensions specified. No evidence was offered to show that any releases were ever required of or made by mechanics or material men, or any other creditor of the Trigg Company, of any lien, claim or demand for material furnished or work done on the said tugboat; but the proof is that, without taking any of the precautions it might have taken under the contract against liens for materials, etc., furnished the Trigg Company in the construction of the tug, the railroad company paid the sum of $12,000 on account of the contract price, $68,-250, prior to the appointment of the receiver. It appears further that on December 17, 1903, this tugboat "Cape Charles" was sold at public auction under decree in this cause, and a sale thereof to the Burley Dry Dock Company, at the price of $5,100 confirmed by decree of January 14, 1904, and this sum of $5,100 for the boat, including hull, machinery and all materials assigned thereto, is the subject of dispute between appellee, New York, Philadelphia and Norfolk Railroad Company, and appellants that we are now considering.

The case presents practically the same facts as those in the case of the Pennsylvania Railroad Company for the construction of the boats "Bristol" and "Chester." We are of opinion that the said fund of $5,100 realized from the sale of the tug "Cape Charles" is liable for the liens of appellants, matured in this cause, and to the rights of the general creditors of the Trigg Company.

The remaining controversy in the case arises out of a contract entered into by the Trigg Company on November 7, 1901, with the Standard Oil Company, of New York, "To build and deliver afloat and complete in all respects, and ready for ser-

vice, . . . according to the plans and specifications hereto attached, a tank steamer, known as 'Hull 19, Lucas.' " The contract price for the tank steamer was $439,500, and was to be paid in twenty installments or partial payments as the work progressed, and nearly, if not all, the stipulations contained in the contracts we have reviewed above, as to inspection, power to reject or approve any materials used, etc., and final payment not to be made till the boat was completed and the machinery proved "satisfactory in all respects," appear in this contract. It is true that the Standard Oil Company is frequently referred to in the contract as "owners," and there appears greater particularity as to details of construction and equipment than in the other contracts; but it is not in any essential features different from those already disposed of in this opinion.

The hull and machinery of the "Lucas" and the materials assembled for its construction were sold under decree entered November 5, 1903, at public auction, to the Standard Oil Company for $35,000, with the use of the Trigg Company's ship-yards for its completion, and the purchase money retained under the control of the court to "await the final decision by the court of the various questions as to title and liens raised by the pleadings."

The Standard Oil Company claims the said sum of $35,000 in virtue of its right to the incompleted vessel, under its contract with the Trigg Company, arguing that the intention of the parties to the contract will control the title to the unfinished vessel, and that the intention to pass the title may be strongly inferred from the supervision of the structure and partial payments at specified stages of the work; admitting, however, that these provisions in the contract are not conclusive of the intention of the parties, and that the weight of authorities in America hold that to ascertain the intention of the parties not only must those provisions be looked to, but the whole contract, together with the surrounding circumstances.

Concede that the qualification of this admission is sound, we cannot see that it affords material aid to the appellee, Standard Oil Company, in view of all the facts and circumstances of the case. If we turn to the surrounding circumstances we find that Myers, the vice-president of the Trigg Company, wrote the agent of the Standard Oil Company, on May 23, 1902: "Please bear in mind that we have received about 80 *per cent.* of the material for this vessel ("Lucas"), and have had only one payment." This would not at all indicate that the first one of the two payments made on the contract price was regulated by the ratio of the materials furnished and work done. There is no significance whatever in the form of the orders for materials for the "Lucas," as they were made upon printed forms used generally by the Trigg Company, with a blank provided for the name of the patron, and the patron's name inserted in every case. Nor can we attach any importance to the construction put upon this contract by the parties thereto, as it is to be construed with deference to the statutory rights of the creditors of the Trigg Company necessarily entering into and forming a part of the contract.

In all of the contracts we have been considering the appellees, including the United States, were contracting with a corporation of the State of Virginia, whose powers were derived from the State, and whose limitations upon its right to sell, mortgage or hypothecate the property of the corporation, to the exclusion of the lien given thereon in favor of those furnishing labor or supplies necessary to the operation of the company's business, are fixed by statute.

In our view there never was a moment of time, from the entering into the several contracts considered in this opinion to the appointment of the receiver in this cause, when the title and possession of the vessel contracted for and all its parts was not in the Trigg Company; and, therefore, there is no escape from the conclusion that these vessels and each of them

are liable to the liens of appellants reported in this cause and to the demands of the general creditors of the Trigg Company.

As already remarked, the decision in *Milhiser* v. *Gallego Mills Co., supra,* has no controlling influence in the determination of the questions considered and decided in this opinion. This is not a case of a supply lien creditor, upon a claim filed in the clerk's office against a manufacturing corporation under our labor and supply lien statute, which is sought to be made to reach back and take from a purchaser or the lender of money property that had already become his; nor will the sustaining of the validity and priority of the liens of appellants impair or affect the protection to commercial credit which the law does and ought to safeguard; nor will doubt be thrown upon mercantile usages and the customs of business men.

If, as was said in the case of *Fid. Ins. Tr. & S. D. Co.* v. *Roanoke Iron Co.* ('C. C.), 81 Fed. Rep. 439, relied on by the learned counsel for the Pennsylvania Railroad Co. in one branch of this case, the property ceased to be the property of the manufacturing company before the supplies were furnished, clearly there would be no lien under the statute for supplies; but that was not the case here. In no branch of this case did the contract with the Trigg Company pass title to or the possession of the vessel to the other party to the contract in absolute right, or as a hypothecation to secure advances made to the contractor. The vessel was in every case in an "undeliverable state," and, therefore, neither the title thereto nor the possession thereof passed from the Trigg Company before the supplies were furnished, as in the case of *Fid. Ins. Tr. & S. D. Co.* v. *Roanoke Iron Co., supra;* and from the reason of the thing and from the words of the statute, as said in that case, the lien for supplies furnished by appellants attached to the vessel from the time the supplies were furnished.

In each of these cases the contract, in so far as it was intended to affect the rights of the Trigg Company's supply lien creditors or its general creditors, can only be regarded as

a mere contract for the loan of money secured by lien on personal property—a chattel—and not as a sale and delivery of the chattel.

If this be not the correct view of these contracts and as to their effect upon the rights of appellants, then we repeat, that our labor and supply lien statutes are of no force or value in any case where a manufacturing company contracts to build a vessel for any individual citizen, a corporation, or the United States Government. The plain language of the statute is, "and all persons furnishing supplies to a mining or manufacturing company necessary to the operation of the same, shall have a prior lien upon the personal property of such company other than that forming part of its plant to the extent of the money due them for such supplies." Words more apt in declaring a *prior* lien upon a certain class of the property of a mining or manufacturing company in favor of persons furnishing it necessary supplies could not have been employed, and it is not pretended that the vessels upon which appellants' liens attached formed a part of the Trigg Company's plant, nor is it denied that the supplies furnished were necessary to the operations of the company.

The learned counsel for appellee, Standard Oil Company, cites the case of *Sir James Laine & Sons, Lim., and Barclay & C. H. L.* (s. c.), decided November 25, 1907, and reported in the February number, 1908, of Appeal Cases, for the proposition that our supply lien statute cannot apply "to an unfinished vessel like the 'Lucas.'" That decision has been carefully examined, and it is found that a similar contention was made in that case to that made here, i. e., that the Scottish Sale of Goods Act could not be held to apply to a ship in the course of construction; but that view was not sustained; and with respect to that decision we deem it only necessary to say that the opinions delivered therein, as we read them, fully sustain the views we have expressed in this opinion, rather than the contentions of appellees.

As far as it has been possible to do so the numerous authorities cited by the learned counsel upon their briefs in these cases and in the oral arguments have been examined, but it would be impossible to review them further than has been done in an opinion of reasonable length. Suffice it to say, that in our judgment the great weight of these authorities sustain the views we have expressed; therefore, we are of opinion, upon the whole case here reviewed, that the court below erred in sustaining the exceptions of appellees to the report of Commissioner Massie finding the liens of appellants upon the several vessels or the proceeds arising from their sale to be prior to any claim of right to or lien upon said vessels asserted by appellees, or either of them; and the decree appealed from will therefore be reversed and annulled, and the cause remanded for further proceedings therein in accordance with the opinion.

BUCHANAN and HARRISON, JJ., dissenting.

We concur in the conclusion reached by the court, except so far as it holds that the supply lien creditors have a claim upon the vessel known as the "Benyuard" superior to that of the United States Government in and to that vessel.

The contract of the William R. Trigg Company with the government expressly provides that the government shall take title to the "Benyuard" as payment is made thereon; and there is, in our opinion, nothing in the contract to show any other or different intent.

We are, therefore, of opinion that on this point the decree appealed from should be affirmed.

WHITTLE, J., concurs with KEITH, P., and CALDWELL, J.

*Reversed.*